UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM T. MONTGOMERY, | ) | Case No.:  3:00 CV 7298 |
| | ) | |
| Petitioner | ) | |
| | ) | JUDGE SOLOMON OLIVER, JR. |
| v. | ) | |
| | ) | |
| MARGARET BAGLEY, WARDEN, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Respondent | ) | **AND ORDER** |

This matter is before the court on William Montgomery's ("Montgomery" or "Petitioner") Petition under 28 U.S.C. § 2254 for Writ Of Habeas Corpus By A Person In State Custody (ECF No. 13) (the "Petition.")  Montgomery alleges forty-eight grounds for relief in his Petition.

Also before the court are Respondent's Return of Writ (ECF No. 25) ("ROW") and Montgomery's Traverse To Respondent's Return Of Writ. (ECF No. 85) ("Traverse.")

For the reasons that follow, Montgomery's petition for a writ of habeas corpus is granted. The Respondent shall either: (1) set aside Montgomery's convictions and sentences as to all counts in the indictment, including the sentence of death; or (2) conduct another trial.  This shall be done within 180 days from the effective date of this Opinion.  On this court's own motion, the execution of this Opinion, and hence its effective date, is stayed pending appeal by the parties.

# I. FACTUAL BACKGROUND

Montgomery appeals from his convictions and death sentence for the aggravated murder of Debra Ogle and Cynthia Tincher.  The facts leading to Montgomery's conviction are as follows:

Between 7:00 a.m. and 7:30 a.m. on March 8, 1986, Cynthia Tincher was found dead, shot in the head, in her car at the corner of Angola and Wenz Roads in Toledo, Ohio.  That same morning, Tincher's roommate, Debra Ogle, did not show up for work and was declared missing.  Four days later, on March 12, 1986, Ogle was also found dead, also shot in the head, in a wooded area off of Hill Avenue.  William Terry Montgomery was charged with two separate counts of aggravated murder with capital specifications for these killings.

The State relied on testimony by Glover Heard ("Heard"), Montgomery's co-defendant.  The State's theory was that Montgomery murdered Ogle while robbing her using a deadly weapon, and then, in one continuous criminal enterprise, murdered Tincher because she was the only person who could place Montgomery with Ogle that morning.  To prove its theory, the State presented, in the form of testimony and exhibits, evidence to support the following factual propositions:

- Montgomery had purchased a .380 caliber semi-automatic pistol and ammunition just weeks before the murders (*See* Blackburn, Tr. IV at 1411-31; Cleland, Tr. IV at 1433-42);
- Montgomery was wearing a dark hooded jacket with the hood tied tight around his face when he entered the gun shop to purchase the pistol (Blackburn, Tr. IV at 1419, 1423-24);
- Montgomery and the young women were acquaintances (*See* Heineman, Tr. IV at 1176-84; Earl, Tr. IV at 1186-97; Roberts, Tr. IV at 1198-1205);
- Both young women were alive the night of March 7th and the early morning hours of March 8th (*See* Glaze, Tr. IV at 1209-20; Bailey, Tr. IV at 1281-93; Heard, Tr. V at 1769; Snyder, Tr. V at 1810);
- Montgomery, Heard, another friend, Bruce Ellis, and Montgomery's then girlfriend, Louren, went out drinking on the night of March 7th (Ellis, Tr. IV at 1445);
- The group did not stop partying until the bar closed in the early morning of March 8th (*Id.* at 1446);

2

- Montgomery was wearing a blue pin striped suit jacket and jeans that night (*Id.*; Randleman, Tr. IV at 1462);
- Later in the morning of March 8th, Montgomery, Louren, and Heard went to Montgomery's uncle's house, where a very drunk Montgomery was arguing with Louren until his uncle broke it up (Randleman, Tr. IV at 1463-66; Heard, Tr. V at 1767);
- After defusing the argument, Montgomery's uncle, Randleman, took a gun away from Montgomery and put it and its clip on top of the refrigerator (Randleman, Tr. IV at 1466);
- The gun Randleman took from Montgomery was a black automatic (*Id.*);
- Montgomery and Heard then left the Randleman residence, both passing through the kitchen where the gun was on top of the refrigerator, to get in a cab (*Id.* at 1488);
- Montgomery was armed with a .380 caliber pistol the morning of March 8th (Snyder, Tr. V at 1807);
- The cab took Montgomery and Heard to Ogle and Tincher's apartment on Hill Avenue at Montgomery's direction (Heard, Tr. V at 1767-68; Reed, Tr. V at 1517);
- Both Montgomery and Heard entered the apartment (Heard, Tr. V at 1769; Snyder, Tr. V at 1810);
- Ogle was getting ready to go to work and Tincher, although she popped out to say hello, was still in bed (Snyder, Tr. V at 1810);
- Ogle agreed to give Montgomery and Heard a ride to Montgomery's mom's apartment on Airport Road (Heard, Tr. V at 1770; Snyder, Tr. V at 1810);
- Montgomery, sitting in the front seat, gave Ogle the directions and eventually told her to stop on the side of the road on Hill Avenue (Heard, Tr. V at 1770-72);
- Ogle and Montgomery got out of her car and walked roughly forty yards into a field or wooded area off Hill Avenue (*Id.* at 1771-72);
- Once in that area, Ogle was in the squat position (*Id.* at 1772);
- Heard heard two gunshots (*Id.* at 1773);
- Heard saw Ogle's body laying on the ground (*Id.*);
- Montgomery rushed back to Ogle's car and motioned for Heard to get in the front passenger's seat as Montgomery got into the driver's seat (*Id.*);
- Montgomery drove Ogle's car back to the victims' apartment complex (*Id.* at 1774);
- Montgomery picked a gun up off the floor of the car, exited the vehicle, and told Heard to take the car (*Id.*);
- Heard then left in the car and took Ogle's wallet as he abandoned the car roughly one block from his home (*Id.* at 1774-75);
- A black person wearing a dark hooded jacket with the hood tied tight around her or his face left Tincher's car the morning Tincher was found at Angola and Wenz Roads (Rank, Tr. IV at 1249-51; Gomell, Tr. IV at 1263, 1265; Mauder, Tr. IV at 1402-03);

3

- On March 9th, Montgomery, with Heard and Armstead, took the blue pin striped suit jacket he wore the night before to the cleaners (Armstead, Tr. V at 1544-46; Grove, Tr. V at 1573-74; Fisher, Tr. V at 1586-87; Heard, Tr. V at 1778; St. Ex. 31);
- The gun Randleman put on top of the refrigerator was not there the next morning, March 9th (Randleman, Tr. IV at 1472);
- A bullet, consistent with the type that could be used in Montgomery's gun which was identified as the murder weapon, was found in Tincher's room in Tincher and Ogle's apartment RKeith, Tr. IV at 1303; PKeith, Tr. IV at 1317.)
- Ogle's car was found roughly one block from Heard's home by police on March 9th (*See* Ragans, Tr. IV at 1334-41);
- Ogle's wallet was found in Heard's dresser drawer (*See* Marok, Tr. IV at 1344-51; Mallory, Tr. IV at 1363-1379);
- A black hooded jacket and a semi automatic pistol manual were found in Montgomery's mother's apartment (Przeslawski, Tr. V at 1670; Marx, Tr. V at 1844);
- Tincher died from a gunshot wound to the head, which entered from the right side (passenger side since Tincher was sitting in the driver's seat of her car) (Patrick, Tr. IV at 1389-91);
- Ogle died from a gunshot wound to the head (Desley, Tr. V at 1633);
- All the discharged bullets and casings at both scenes were fired from the .380 caliber semi automatic pistol that Montgomery's mother gave police, which was the same gun Montgomery purchased just weeks earlier–the .380 caliber Bursa semi automatic pistol (*See* Alexander, Tr. VI at 1870-1902); and
- Montgomery led the police to the wooded area where Ogle's body was discovered (Marx, Tr. V at 1851-55).

The defense did not present any witnesses.  Rather, the defense relied on cross-examination in an attempt to raise reasonable doubt about Montgomery's guilt.  The defense was able to elicit testimony that impeached some of the State's witnesses, including:

- Not all of the witnesses that saw the person leaving the area where Tincher was found could determine the gender of the fleeing individual (Gomell, Tr. IV at 1265; Mauder, Tr. IV at 1409);
- Those witnesses could not determine the color or the material of the hooded jacket (Rank, Tr. IV at 1249-51; Gomell, Tr. IV at 1273-75; Mauder, Tr. IV at 1409-11);
- No fingerprints were found on Ogle's car (Mallory, Tr. IV at 1380.)
- Besides Tincher's, no identifiable fingerprints were found on Tincher's car (*Id.* at 1381);

4

- No fingerprints were found on the pistol Montgomery's mother gave police, which was identified as the murder weapon (Marx, Tr. V at 1851);
- The clerk who sold Montgomery the .380 caliber pistol, who remembered what he was wearing the day he purchased the gun, admitted she never remembered what any other customers were wearing (Blackburn, Tr. IV at 1426-29);
- Ellis never saw Montgomery with a gun on March 7th, the night the group went out drinking or any other time (Ellis, Tr. IV at 1459-60);
- Montgomery did not have a dark hooded jacket with him that night (Heard, Tr. V at 1794);
- Montgomery always had money, had money March 7th, and paid for the entire group to go out on March 7th (Ellis, Tr. IV at 1453; Randleman, Tr. IV at 1502; Heard, Tr. V at 1785);
- Montgomery and Heard both left through the kitchen where the pistol Randleman took from Montgomery was located (Randleman, Tr. IV at 1488.)
- Montgomery was not angry when he and Heard arrived at Ogle and Tincher's apartment (Heard, Tr. V at 1787);
- Montgomery and Heard had never discussed robbing anyone that night (*Id.* at 1789);
- Montgomery, despite giving various accounts, always maintained to police that Heard, not he, killed the young women (*See* Przeslawski, Tr. V at 1653-1759; Snyder, Tr. V at 1804-36); and
- Montgomery told police that Heard had showed him the area where he, Heard, killed Ogle (Przeslawski, Tr. V at 1747-48).

The defense impeached Heard's testimony by showing that Heard had received a deal in exchange for his testimony, which dropped two aggravated murder charges and another charge of gross sexual imposition involving a five-year old minor for his pleading guilty to complicity to murder and his testimony. (Heard, Tr. V at 1765, 1796-97).  Additionally, the defense showed that Heard had told police four different stories about the murders, *id.* at 1780-84, and had heard only two gun shots even though the coroner testified there were three gun shot wounds to Ogle's body. (*Id.* at 1793; Desley, Tr. V at 1619-20).  Heard admitted that he was going to take Ogle's car, regardless of Montgomery telling him to, because it was cold and he did not want to have to walk home (Heard, Tr. V at 1795)  Heard's testimony was further impeached when Detective Marx

5

admitted that during questioning he had told Heard it was impossible for Heard to have seen Ogle's body from where he was sitting in Ogle's car after he heard the gun shots. (Marx, Tr. V at 1864-68.)

## II. PROCEDURAL HISTORY

After a trial, a Lucas County jury found Montgomery guilty of one count of murder, and one count of aggravated murder with two specifications: (1) as part of a course of conduct involving purposeful killing of two or more persons; and (2) while committing or attempting to commit aggravated robbery.  All counts arose from the shooting deaths of Debra Ogle and Cynthia Tincher.

Following the sentencing phase of trial, the jury recommended and the trial court imposed, a death sentence for the aggravated murder count.

### A.  Direct Appeal

Montgomery's direct appeal of his conviction and sentence to the Ohio Court of Appeals raised the following grounds of error:

a.      The trial court erred in denying appellant's motion to dismiss the indictment for the reason that it violated federal and state constitutional guarantees.

b.      The trial court erred and denied appellant his due process right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution when it instructed the jury at the sentencing phase that the sentencing determination was merely a recommendation, thereby placing an irrelevant and arbitrary factor into the jury's deliberations, and seating a jury which favored the death penalty.

c.      By permitting the venire to be 'death-qualified', the appellant's Sixth and Fourteenth Amendment right to a fair and impartial jury guaranteed by the federal and state constitutions were violated.

I. Excluding death penalty opponents results in a jury which is more likely to convict the Defendant and is therefore not impartial.

6

II. Excluding the panel of death penalty opponents results in a jury which is not drawn from a fair cross-section of the community.

III. Death-qualification of the jury is improper because the trial judge ultimately imposes the death sentence; therefore, by asking voir dire questions concerning the death penalty in this case, the trial court violated the appellant's right guaranteed under the Eighth and Fourteenth Amendments of the U.S. Constitution and Article I, Sections 9 and 16, of the Ohio State Constitution.

d.      Ohio's death penalty statute is violative of the Sixth and Fourteenth Amendments of the United States Constitution in that it fails to allow for the impaneling of a separate jury for the second stage of his bifurcated trial.

e.      The trial court erred to the prejudice of the appellant and violated his Sixth and Fourteenth Amendment rights to a fair and impartial jury by asking its own 'death-qualifying' question to potential jurors that neither conforms to *Witherspoon v. Illinois* nor Ohio statutory mandates.

f.      The trial court's sentencing procedure was arbitrary and violative of the due process clauses of the United States and Ohio Constitutions.

g.      The trial court erred in denying appellant's request for permission to open and close the arguments at the conclusion of the sentencing hearing.

h.      The trial court erred by failing to replace juror number 1 (Georgia Lukasiewicz) after she exhibited bias and abnormal reasoning during the deliberation phase of the mitigation hearing.

i.      Defendant's constitutional rights were violated by the prosecutor's use of inflammatory and prejudicial language throughout his entire closing arguments.

j.      Prejudicial remarks by the Prosecution were improper and entitle Defendant to a new trial.

k.      The trial court erred when it failed to instruct the jury to disregard testimony objected to and subsequently sustained.

l.      The trial court erred by not granting Defendant's motion for a change of venue.

m.      The trial court erred when it denied the juror's request for added instruction on mitigation.

7

n.     Defendant's constitutional rights were violated when the jury was allowed to consider statutorily irrelevant aggravating factors.

o.     The Prosecution's indirect comment on Defendant's silence violated Defendant's rights, Fifth, Sixth and Fourteenth Amendments, and therefore entitles him to a new trial.

p.     The Defendant's conviction is against the manifest weight of the evidence and contrary to law in that there was never any showing that the Defendant purposely caused the death of Debra Ogle, while committing or fleeing immediately after committing aggravated robbery.

The Ohio Court of Appeals affirmed the convictions and the sentence. *State v. Montgomery*, 1988 WL 84427 (Ohio Ct. App. Aug. 12, 1988). The Ohio Supreme Court also affirmed Montgomery's conviction and sentence. *State v. Montgomery*, 61 Ohio St. 3d 410 (1991). Montgomery raised the following claims of error before the Ohio Supreme Court :

*Proposition of Law No. I* [:] A capital conviction and death sentence cannot stand when the trial record is replete with prosecutorial misconduct.

*Proposition of Law No. II* [:] A trial court errs when it fails to replace a juror after she exhibited bias and abnormal reasoning.

*Proposition of Law No. III* [:] Ohio's mandatory capital sentencing scheme prevented appellant Montgomery's jury from deciding whether death was the appropriate punishment in violation of appellant Montgomery's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. IV* [:] A juvenile conviction should not be considered by a capital jury during the sentencing phase of a capital trial where the defense does not raise the defendant's lack of a criminal record as a mitigating factor.

*Proposition of Law No. V* [:] A capital sentencer's refusal to weigh mitigating evidence and its reliance on non-statutory aggravating circumstances render the sentence of death unreliable, inappropriate and constitutionally infirm under the Eighth and Fourteenth Amendments to the United States Constitution and § 9, Article I of the Ohio Constitution.

*Proposition of Law No. VI* [:]  It is error for a trial court to deny a capital defendant a one day continuance to prepare for the mitigation phase of his capital trial after a guilty verdict is returned.

*Proposition of Law No. VII* [:]  The trial court errs when it fails to grant appellant's motion for acquittal when there is insufficient evidence to sustain a conviction.

*Proposition of Law No. VIII* [:]  A conviction and death sentence cannot stand when it is against the weight of the evidence presented at trial.

*Proposition of Law No. IX* [:]  Former R.C. 2923.03(D) prohibited a conviction based solely on the uncorroborated testimony of an accomplice and the trial court erred in overruling a Crim.R. 29 motion for judgment of acquittal where there was not sufficient evidence to corroborate the accomplice testimony.

*Proposition of Law No. X* [:]  A trial court errs when it fails to charge the jury on the lesser included offenses of involuntary manslaughter or voluntary manslaughter and incorrectly instructs the jury concerning a capital specification.

*Proposition of Law No. XI* [:]  A trial court errs by instructing a capital sentencing jury as to all the mitigating factors in R.C. 2929.04(B) when the defense had not raised all such factors in its mitigation presentation;  the instruction violates an appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and  §§ 2, 9, and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XII* [:]  Jury instructions requiring unanimity for a life verdict at the penalty phase deny the accused his right to a fair trial and freedom from cruel and unusual punishment in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and  §§ 9 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XIII* [:]  The trial court's penalty phase instruction on reasonable doubt shifted the burden of proof to appellant, and allowed the state to prove fewer than every element needed to impose the death sentence in violation of appellant's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and  §§ 2, 9, 10 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XIV* [:]  A prosecutor's use of peremptory challenges to exclude prospective jurors with some reservations about the death penalty violates a capital defendant's rights to a fair and impartial jury as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and §§ 5, 10 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XV* [:]  The trial court erred in failing to excuse for cause two jurors that were biased against the appellant.   This failure denied appellant a fair trial by an impartial jury as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and  §§ 5, 10 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XVI* [:]  The appellant's rights under the Fourteenth Amendment to the United States Constitution and § 2, Article I of the Ohio Constitution were violated when the prosecution used its challenges to remove a black member from appellant's jury.

*Proposition of Law No. XVII* [:]  The Sixth and Fourteenth Amendments to the United States Constitution, §§ 10 and 16, Article I of the Ohio Constitution and  §§ [*sic* ] 2945.25(C) of the Ohio Revised Code, guarantee an accused a fair trial and an impartial jury.   The exclusion of potential jurors Gorsuch, Faison and Serke denied appellant Montgomery these constitutional guarantees.

*Proposition of Law No. XVIII* [:]  When a capital defendant receives the ineffective assistance of counsel the reliability of his conviction and death sentence are undermined.

*Proposition of Law No. XIX* [:]   The failure to raise or adequately address substantial capital and other well-established criminal law issues on appeal as of right deprives the capital defendant of the effective assistance of appellate counsel and the meaningful appellate review of a capital conviction guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution,  §§ 10 and 16, Article I of the Ohio Constitution and R.C. 2929.05.

*Proposition of Law No. XX* [:]  The trial court's instruction on the mens rea element of 'purpose' created an unconstitutional conclusive presumption and relieved the state of its burden to prove this material element beyond a reasonable doubt.

*Proposition of Law No. XXI* [:]  Inflammatory and gruesome photos of the victim were admitted during the guilt phase of appellant Montgomery's trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and  §§ 10 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XXII* [:]  When a capital defendant's arrest is based on outstanding forgery warrants, the arrest is pretextual and any evidence obtained concerning the murder is inadmissible.

*Proposition of Law No. XXIII* [:]  Failure of the trial court to adequately admonish the jury violates appellant's right to a fair trial by an impartial jury as guaranteed by

10

the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and §§ 10 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XXIV* [:] It is error to instruct a capital sentencing jury that its verdict is only a recommendation, thereby diminishing the jury's responsibility for its decision and misleading the jury concerning its key role in sentencing and is in violation of the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XXV* [:] A capital defendant is denied his right to remain silent when the prosecutor comments to the jury concerning that silence in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and §§ 10 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XXVI* [:] Death qualification of a jury denies the accused equal protection of the law as guaranteed by the Fourteenth Amendment to the United States Constitution and § 2, Article I of the Ohio Constitution.

*Proposition of Law No. XXVII* [:] Appellant Montgomery's rights under the Eighth and Fourteenth Amendments to the United States Constitution, Section 9, Article I of the Ohio Constitution, and R.C. 2929.04(B)(7), were violated when the trial judge prevented the sentencing jury from considering relevant proffered evidence in mitigation of the death sentencing.

*Proposition of Law No. XXVIII* [:] The death sentence imposed in appellant Montgomery's case was inappropriate and disproportionate and violated the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution.

*Proposition of Law No. XXIX* [:] A motion for a change of venue should be granted when it is apparent that a fair and impartial trial cannot be had in the county in which the case is pending.

*Proposition of Law No. XXX* [:] The felony-murder specification in R.C. 2929.04(A)(7) fails to narrow the class of persons eligible for the death penalty and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Section 9, Article I of the Ohio Constitution.

*Proposition of Law No. XXXI* [:] The Fifth, Eighth and Fourteenth Amendments to the United States Constitution, §§ 10 and 16, Article I of the Ohio Constitution and Ohio Revised Code Section 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutorily mandated proportionality process in Ohio is fatally flawed thereby denying appellant Montgomery the above rights.

11

*Proposition of Law No. XXXII* [:] The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I establish the requirements for a valid death penalty scheme. Ohio's statutory provisions governing the imposition of the death penalty, contained in [R.C.] 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 do not meet the prescribed requirements and, thus, are unconstitutional, both on their face and as applied to appellant Montgomery.

The United States Supreme Court denied Montgomery's petition for a writ of certiorari.

*State v. Montgomery*, 502 U.S. 1111 (1992).

     B.     *Application for Delayed Reconsideration*

     **1.**     **Ohio Court of Appeals**

On November 27, 1992, Montgomery filed an application in the Ohio Court of Appeals for delayed reconsideration claiming ineffective assistance of appellate counsel (i.e., a *Murnahan*[1] petition). On March 3, 1993, the Court of Appeals denied Montgomery's application for delayed reconsideration. *State v. Montgomery*, 1993 WL 110901. Montgomery appealed.

     **2.**     **Ohio Supreme Court**

Before the Ohio Supreme Court, Montgomery argued the following four claims:

(1)     the application of the doctrine of res judicata denies meaningful consideration of Appellant's claims of ineffective assistance of appellate counsel in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 9, 10, and 16, of the Ohio Constitution;

(2)     the Court's failure to order that the Court of Appeals record be delivered in Appellant's direct appeal of right in the above captioned case violated Appellant's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 2, 9, 10, and 16 of the Ohio Constitution;

---

[1]     Ohio Rule of Appellate Procedure 26(B) codified the rule in *State v. Murnahan*, 63 Ohio St. 3d 60 (1992), which provides for delayed reconsideration due to ineffective assistance of appellate counsel.

12

(3)     the Court of appeals improperly addressed the merits of four claims without permitting briefing by the Appellant and without having a complete record in violation of Appellant's rights to the effective review under the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States, Article I, §§ 2, 10, and 16, of the Ohio Constitution, and Ohio Rev. Code Ann. § 2929.05; and

(4)     the failure to exercise reasonable professional judgment in raising and preserving constitutional issues in the direct appeals of capital cases denies Mr. Montgomery the effective assistance of appellate counsel guaranteed by the Due process Clause of the Fourteenth Amendment.

(Ex. E to Petition.)

The Ohio Supreme Court affirmed the denial of the application on October 27, 1993. *State v. Montgomery*, 67 Ohio St. 3d 1487 (1993).

*C. Post-Conviction Proceedings*

**1. Trial Court**

Montgomery then filed a post-conviction petition with the trial court.  His petition included the following claims for relief and was summarily dismissed without an evidentiary hearing, *State v. Montgomery*, No. CR86-5450, slip op.  (Ohio Ct. Common Pleas, Aug. 23, 1996):

1. The state engaged in four specific instances of prosecutorial misconduct during the voir dire of petitioner's jury.

2. The state engaged in eight specific instances of prosecutorial misconduct during the culpability phase of petitioner's trial.

3. The state engaged in nine specific instances of prosecutorial misconduct during the penalty phase of petitioner's trial.

4. One of the jurors was biased against petitioner, irrational, and incompetent to serve as a juror.

5. The jury was erroneously instructed that if it should find that no mitigating factors exist, or that the aggravating circumstances outweighed the mitigating factors, then it must sentence petitioner to death.

13

6. The state was allowed to present evidence during the penalty phase of the trial regarding petitioner's prior juvenile adjudications.

7. The trial court's sentencing opinion impermissibly took into consideration non-statutory aggravating circumstances while ignoring relevant mitigating factors.

8. The trial court denied petitioner's motion for continuance, thus forcing the case to proceed to the penalty phase on the day after the jury returned a verdict of guilty.

9. There was insufficient evidence presented at trial for a reasonable juror to find beyond a reasonable doubt that petitioner committed or attempted to commit aggravated robbery.

10. There was insufficient evidence presented at trial for a reasonable juror to find beyond a reasonable doubt that petitioner purposefully caused the death of Debra Ogle while committing or attempting to commit aggravated robbery.

11. The only direct evidence that petitioner killed either Debra Ogle or Cynthia Tincher came from the uncorroborated testimony of an admitted accomplice. At the time of petitioner's trial, R.C. 2923.03(D) dictated that no conviction could be based solely upon the uncorroborated testimony of an accomplice.

12. The trial court failed to instruct the jury on the lesser included offenses of voluntary manslaughter and involuntary manslaughter.

13. The trial court incorrectly charged the jury that the state had proven a death specification if they found beyond a reasonable doubt that petitioner purposefully killed Ogle and/or Tincher while committing aggravated robbery, and that petitioner was the principal offender in the aggravated robbery.

14. The trial court improperly instructed the jury on all seven mitigating factors found in R.C. 2929.04(B), despite the fact that petitioner only presented evidence on three of those factors.

15. The trial court improperly instructed the jury that in order to sentence petitioner to life in prison, it was necessary to reach a unanimous verdict.

16. The trial court erroneously instructed the jury that "reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge."

17. The state used peremptory challenges to exclude from the jury three members of the venire who expressed reservations about the death penalty despite those jurors' assertions that they could be fair and follow the court's instructions.

14

18. The trial court improperly refused to excuse for cause two venirepersons who harbored biases against petitioner.

19. The state was allowed to systematically eliminate African-Americans from the petitioner's jury.

20. The trial court did not require the state to provide a racially neutral reason for its use of a peremptory challenge after petitioner objected.

21. The trial court improperly excused for cause three jurors because of their expressed views on capital punishment.

22. The trial court erroneously charged the jury that "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon."

23. The trial court improperly precluded petitioner from introducing relevant mitigation evidence that mistakes can be made in our justice system.

24. The death sentence imposed upon petitioner was inappropriate and disproportionate to the nature of the crime of which he was convicted and to the leniency afforded his co-defendant.

25. Petitioner's conviction and/or sentence are void or voidable because the trial court refused to grant petitioner's motion for a change of venue based on excess media coverage.

26. The state used the same underlying offense, aggravated robbery, both to elevate the killing of Ogle from murder to aggravated murder and to represent an aggravating circumstance in the penalty phase of the trial.

27. Petitioner was not afforded a fair proportionality review by either the trial court or any of the courts that have reviewed his appeal.

28. The capital punishment provisions of the Ohio Revised Code are unconstitutional on their face and as applied to petitioner.

29. The trial court refused to respond to a request for additional instructions from the jury.

30. The state was allowed to give the first and last closing arguments during the penalty phase of petitioner's trial.

15

31. The death penalty in Ohio is administered arbitrarily and capriciously and execution by means of electrocution is cruel and unusual.

32. The Ohio death penalty violates international laws and Article VI of the United States Constitution.

33. The grand jury proceedings were not recorded in violation of Crim.R. 22.

34. On appeal, the state failed to prove beyond a reasonable doubt that any constitutional error which occurred during petitioner's trial did not contribute to petitioner's conviction and sentence.

35. R.C. 2929.03(D)(1) is unconstitutional.

36. Petitioner was required to prove the existence of mitigating factors by a preponderance of the evidence.

37. Article I, Section 9 of the Ohio Constitution, which allowed the state to hold petitioner without bond, is unconstitutional.

38. Petitioner was illegally held without bond for five months pending trial.

39. Statements made by petitioner to police officers in response to interrogations should have been suppressed because they were made before petitioner was given his *Miranda* warnings.

40. Petitioner was not adequately advised of his *Miranda* warnings.

41. The trial court failed to maintain a complete record of all proceedings.

42. Neither the jury, the trial court nor the reviewing courts have considered the mitigating factor of extreme intoxication.

43. The jury erroneously considered the absence of statutory mitigating factors as non-statutory aggravating circumstances in the penalty phase of the trial.

44. The jury and trial court erroneously considered petitioner's juvenile adjudication for involuntary manslaughter to be a non-statutory aggravating circumstance in the penalty phase of the trial.

45. Petitioner was deprived of a fair and impartial jury in that two of petitioner's jurors were acquainted with police officers who testified for the state at trial.

46. Petitioner was deprived of a fair and impartial jury because one of the jurors was predisposed to automatically vote for the death penalty in all cases where the alternative was life in prison.

47. The state failed to prove that petitioner intended to permanently deprive Ogle of her motor vehicle and thus failed to prove the associated felony of aggravated robbery.

48. Petitioner is factually and actually innocent.

49. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 12, 1986, during a search of the residence of co-defendant, Glover Heard, the police found a pair of Nike shoes which had bloodstains on them.

50. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that at approximately 1:20 a.m. on March 12, 1986, Debra Ogle was seen alive by seven witnesses, with whom she had gone to high school, in the parking lot of her apartment complex.

51. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that stains found in the seat of Tincher's car were bloodstains.

52. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that stains found on petitioner's jacket were in fact saliva stains and not, as the state represented at trial, bloodstains.

53. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that police had received numerous reports that Tincher and Ogle were killed by a third suspect, an alleged "hit-man" for a drug cartel.

The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 8, 1986, four witnesses, in addition to the three who testified at trial, saw the car on the corner of Wenz and Angola in which Tincher's body was discovered and that these four witnesses described an individual very different in appearance from petitioner running away from the car.

55. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 8, 1986, at approximately 7:30 a.m., a witness saw a second car parked at the intersection of Wenz and Angola and saw Tincher's car stop as if to meet that car.

17

56. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that on March 8, 1986, neighbors heard unidentified male voices arguing all night long in Tincher's and Ogle's apartment.

57. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that Tincher was terrified of her step-father, a Toledo police officer, who had once, allegedly, sexually molested Tincher and who was allegedly stalking her around the time of the murders.

58. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that prior to their deaths a witness observed both Tincher and Ogle as being nervous and upset, thus rebutting the state's representation at trial that this was a "spur of the moment" crime.

59. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that Ogle and Tincher were killed by someone other than petitioner and that Ogle's prior and current boyfriends were primary suspects in the murders.

60. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: that contrary to testimony at trial, Detective Marx, not Detective Przeslawski, was the author of all police reports in the instant matter.

61. The state knowingly and purposefully withheld relevant, exculpatory evidence, to wit: information in its possession that its representation of how it obtained an alleged confession from co-defendant Glover Heard was a complete fabrication.

62. Evidence was manufactured against petitioner by Detective Keefe Snyder to advance his racist agenda. Snyder's claim that petitioner made inculpatory statements during a polygraph examination is therefore totally incredible.

63. Petitioner's trial counsel was ineffective in that they failed to adequately investigate in preparation for the penalty phase of petitioner's trial.

64. Petitioner's trial counsel was ineffective in that they failed to adequately investigate in preparation for the culpability phase of petitioner's trial and failed to uncover exculpatory information concealed by the state.

65. The state engaged in prosecutorial misconduct throughout all phases of petitioner's trial in that the state was in possession of material exculpatory evidence which it concealed from petitioner.

66. Petitioner's convictions and sentence are unconstitutional because of systemic racism existing in the capital charging system utilized by Lucas County.

18

67. The capital sentencers did not have before them relevant mitigating evidence of petitioner's excellent disciplinary record since his incarceration on death row.

68. Jurors were erroneously informed that their decision to sentence petitioner to death was only a recommendation.

69. Because of the existence of a sufficient amount of residual doubt, the aggravating factors cannot possibly outweigh the mitigating evidence presented in this case.

70. The cumulative effect of the errors and omissions presented in this petition establish that petitioner was deprived of a fair trial.

### 2. Ohio Court of Appeals

Montgomery appealed that decision to the Ohio Court of Appeals, raising the following claims of error:

1.   The trial court erred in dismissing the Petition without ruling on Discovery issues.
2.   The trial court erred in granting summary judgment without giving petitioner the  opportunity to respond to the motion under *State v. Pless*, 91 Ohio Ct. App. 3d 197 (1993)
3.   The trial court erred in denying an evidentiary hearing in post-conviction.
4.   The trial court erred in denying relief on Petitioner's *Brady* claims.
5.   The trial court erred in dismissing the post-conviction petition.
6.   The trial court erred in denying post-conviction claims 5, 6, 12, 13, 14, 15, 16, 36, 43, and 44 on the basis of res judicata.

The Court of Appeals reversed the trial court's denial of post-conviction relief as to issue 2 on October 24, 1997, and remanded the case to allow Montgomery to respond to the State's motion for summary judgment. *State v. Montgomery*, No. L-96-308, slip. op. (Ohio Ct. App. Oct. 24, 1997) (Exh. 42)**.**  The Lucas County Court of Common Pleas again dismissed the petition on December 31, 1997.  *State v. Montgomery,* No. CR86-5450 , slip. op. (Ohio Ct. of Common Pleas, Dec. 31, 1997). The Ohio Court of Appeals affirmed the dismissal on February 5, 1999. *State v. Montgomery,* 1999

WL 55852. On June 16, 1999, the Ohio Supreme Court dismissed Montgomery's appeal. *State v. Montgomery*, 86 Ohio St. 3d 1402 (1999).

> D. *Habeas Corpus*

On June 13, 2000, Montgomery filed this Petition for Writ of Habeas Corpus. (ECF No. 13.) In his petition, Montgomery identified forty-eight general areas of alleged constitutional violation. Those are:

> 1. *Petitioner was denied his right to a fair trial by an impartial jury in a capital case, as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution by the trial court's failure to excuse an obviously biased and incompetent juror.*
>
> 2. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court excluded, for cause, jurors based on their views about capital punishment.*
>
> 3. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to excuse for cause two jurors who were biased against him.*
>
> 4. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the State of Ohio used its peremptory challenges to exclude individuals who expressed reservations about the death penalty.*
>
> 5. *Death qualification of the jury that convicted and sentenced him to death denied Petitioner of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*
>
> 6. *Misconduct by the prosecuting attorney in the voir dire stage of the trial proceedings deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

20

7. *Petitioner was denied his right to remain silent when the prosecutor improperly commented to the jury concerning his silence in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

8. *Petitioner's conviction and sentence are in violation of the Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

9. *Petitioner's sentence of death is in violation of the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because a complete record of all of the proceedings was not maintained and the appellate review was done from an incomplete record.*

10. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that statements were taken from him in violation of the requirements of Miranda v. Arizona, 396 U.S. 868 (1969).*

11. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the state was not required to provide a race-neutral explanation for its use of peremptory challenges.*

12. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution as the state systematically eliminated African-Americans from the jury.*

13. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the capital charging system of Lucas County is infected with systemic racism.*

14. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that two of the jurors who convicted him and sentenced him to death were acquainted with police officers who testified at his trial.*

15. *Misconduct by the prosecuting attorney in withholding evidence favorable to the petitioner on the issue of guilt deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

16. *Misconduct by the prosecuting attorney in the guilt stage of the trial proceedings deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

17. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the jury was shown inflammatory and gruesome photos of the victim during the guilt phase of his trial.*

18. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that evidence that was presented against him was manufactured for the advancement of an investigating officer's racist agenda.*

19. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution as he received the ineffective assistance of counsel during both the guilt determination and penalty phases of his capital trial.*

20. *Petitioner's convictions and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the evidence was insufficient as a matter of law to sustain his capital felony murder and murder convictions.*

21. *Petitioner's convictions and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to adequately admonish the jury both before and during Petitioner's capital trial.*

22. *Petitioner's convictions and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the*

*United States Constitution in that the trial court failed to properly instruct the jury at the guilt phase of the trial.*

23. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that there is a sufficient amount of residual doubt that exists to cause the sentencer to find that the mitigation outweighs the aggravating circumstances in this case.*

24. *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court and jury did not have before them nor did they consider all relevant mitigating evidence.*

25. *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the jury considered the absence of mitigation as an aggravating factor.*

26. *Petitioner's death sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the state was allowed to present evidence of a prior juvenile conviction and the sentencers considered the conviction as an aggravating circumstance.*

27. *The requirement that Petitioner prove the existence of mitigating factors by a preponderance of the evidence precluded the sentencer from considering all of the mitigating evidence and compelled a presumption of death in violation of his Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

28. *Petitioner's death sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that Ohio's statutory scheme provides that findings of pre-sentence investigations be furnished to the judge, jury, and prosecutor who may use the evidence against him in determination of his sentence.*

29. *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the state was permitted to argue first and last at the mitigation phase of the proceedings.*

30. *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because he was not permitted a continuance between the guilt and mitigation phases of the trial.*

31. *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the trial court improperly considered nonstatutory aggravating circumstances, ignored relevant mitigating factors, and submitted an inadequate sentencing opinion.*

32. *Misconduct by the prosecuting attorney in the mitigation stage of the trial proceedings deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

33. *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the trial court improperly instructed the jury at the mitigation phase of the trial.*

34. *Petitioner's convictions and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court refused to answer the jury's request for additional instructions.*

35. *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that it is inappropriate and disproportionate to the sentence received by his co-defendant.*

36. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that he was denied the procedural safeguards of a meaningful proportionality review.*

37. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that his appellate counsel failed to raise or adequately address substantial capital and other well-established criminal law issues on appeal.*

38. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the state failed to prove beyond a reasonable doubt that any Constitutional error which occurred at his trial was harmless.*

39. *Petitioner Montgomery's death sentence is unreliable, inappropriate, and violates the Eighth and Fourteenth Amendments to the United States Constitution.*

40. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the evidence presented at trial was insufficient as a matter of law to sustain conviction.*

41. *Petitioner's conviction and sentence are in violation of the Eighth and Fourteenth Amendments to the United States Constitution due to the use of the same specifications elevates the crime with which he was charged to a higher level and to make him death eligible.*

42. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that he was made death-eligible by the commission of a misdemeanor.*

43. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to grant a change of venue.*

44. *Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution were violated in that he was improperly denied his right to bond.*

45. *The statutory provisions governing the Ohio capital punishment scheme violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. Petitioner's conviction and sentence are improper in that the scheme is unconstitutional on its face and as applied to him.*

46. *The Ohio death penalty statute violates Article VI of the United States Constitution and various international laws. Petitioner's*

25

*conviction and sentence are improper in that the statute has been applied to him.*

47. *Petitioner's sentence is improper as death by electrocution constitutes a blatant disregard for the value of human life, entails unnecessary and wanton infliction of pain, and diminishes the dignity of man and violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

48. *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that he is actually innocent of the offenses for which he was convicted and sentenced to death.*

### III. INITIAL CONSIDERATIONS

A. *Standard of Review: The AEDPA*

A federal court's consideration of a petition for a writ of habeas corpus filed by a person imprisoned under the judgment of a state court is governed by 28 U.S.C. § 2254(a).  Section 2254 permits the state prisoner to challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." *Id.*  Federal habeas corpus relief "does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Thus, "it is not the province of a federal habeas court to re-examine state-court determinations of state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.1.No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), signed into law on April 24, 1996, amended Title 28 of the United States Code and applies to all habeas petitions filed on or after its April 24,1996 effective date.  *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999) (citations omitted); *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). The AEDPA made significant changes in habeas law, including increasing the restrictions on which issues can be appealed and heightening the respect for state court factual and

26

legal determinations. Because Montgomery filed this habeas petition on June 16, 2000, long after the AEDPA effective date, the AEDPA applies to this petition. *See, e.g., Williams v. Coyle*, 167 F.3d 1036, 1040 (6th Cir. 1999). Having determined that the AEDPA applies to the petition, the court will next address the appropriate standard of review.

Under 28 U.S.C. § 2254(d) (enacted as a part of the AEDPA), a petition for writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

*Id.*; *Staley v. Jones*, 239 F.3d 769, 775 (6th Cir. 2001).

The United States Supreme Court interpreted § 2254(d) in *Williams v. Taylor*, 529 U.S. 362 (2000), explaining that with respect to the first clause of § 2254(d), the phrases "contrary to" and "unreasonable application of" must be given independent meanings:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (citing *Green v. French*, 143 F.3d 865, 869-70 (4th Cir. 1998), *cert. denied,* 525 U.S. 1090 (1999)). The Supreme Court construed the second clause of § 2254(d) as follows:

> [A] state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. [Additionally,] a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407.

The Court pointed out that, in determining the reasonableness of the state court's decision, the federal court must employ an objective, not subjective, test.[2] When viewing the objective reasonableness of the state court decision, however, a federal court may not find an application to be unreasonable merely because it finds that the state court decision was erroneous or incorrect. *Williams*, 529 U.S. at 410-12; *Maranian v. Jackson*, No. 99-2017, 2001 WL 700856 (6th Cir. Jun. 11, 2001).

The *Williams* Court also clarified that "clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." 529 U.S. at 412. The Sixth Circuit later held that this holding "prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law." *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000) (quoting *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)), cert. denied, 121

---

[2]    With this determination, the Supreme Court rejected the Fourth Circuit's interpretation that a state court's application of federal law was only unreasonable "if the state court has applied federal law in a manner that reasonable jurists would all agree is unreasonable." *William*s, 529 U.S. at 409.

S. Ct. 1415 (2001). A habeas court may thus only rely on that class of Supreme Court precedent that would qualify as an "old rule" under *Teague v. Lane*, 489 U.S. 288 (1989).[3] *Williams*, 529 U.S. at 412.

Under the AEDPA, state determinations of factual issues are presumed to be correct. 28 U.S.C. § 2254(e)(1). This presumption of correctness is rebuttable only by clear and convincing evidence otherwise. *Id.*

B.    *Exhaustion*

The process of presenting a constitutional claim to the state's highest court is called exhaustion. Under the AEDPA, as under the former habeas statute, a prisoner must exhaust his available state court remedies before petitioning for a writ of habeas corpus. 28 U.S.C. § 2254(b)(1)(A).  Habeas relief cannot be granted based on claims that have not been exhausted.[4] *Id.*; *see also Rose v. Lundy*, 455 U.S. 509 (1982). A state cannot be deemed to have waived the exhaustion requirement unless the state, through counsel, expressly waives it. 28 U.S.C. § 2254(b)(3).

Here, although not expressly waiving the exhaustion requirement, Ohio concedes that Montgomery has exhausted all of his habeas claims.

---

[3]        Under *Teague*, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. *Teague*, 489 U.S. at 301. Thus, the rule the petitioner relies upon must be "dictated or compelled" by the cited Supreme Court decision. *Harris*, 212 F.3d at 944.

[4]        An exception exists where the petitioner can show that there is an absence of available state corrective procedures or that circumstances exist that would render such process ineffective to protect the rights of the petitioner. 28 U.S.C. § 2254(b)(1)(B)(i-ii).

Respondent observes that all of Montgomery's claims are exhausted. The claims are exhausted because they were either raised properly on direct appeal to the Ohio Supreme Court, raised in post-conviction and barred from review on the basis of *res judicata*, raised and considered or barred in an application for reopening proceeding, or there is no remaining avenue by which Montgomery can now fairly present these claims to the state court.

By pointing out that Montgomery's claims have been exhausted because there are no remaining state court remedies, Respondent expressly does not waive the exhaustion requirement.  28 U.S.C. § 2254(b)(3); *compare Dennis v. Mitchell*, 68 F. Supp. 2d 863, 879 (N.D. Ohio 1999) (finding Respondent waived exhaustion requirement by stating that claims in petition were exhausted) *with* Habeas Rule 5 (Respondent's answer shall state whether petitioner has exhausted remedies.) Respondent wishes it to be clear that by stating her view that Montgomery has exhausted all claims, she does not intend to waive the exhaustion requirement.

(ROW 35.)  The court concludes that the asserted grounds for relief have been exhausted.

###### C.    *Procedural Default*

Federal courts "will not review question[s] of federal law decided by a state court if the decision of that court rests upon a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). "Applied to the habeas context, the doctrine of procedural default acts to bar federal review of federal claims that a state court has declined to address because of the Petitioner's noncompliance with a state procedural requirement." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  "In these cases, the state judgment rests on independent and adequate state procedural grounds." *Coleman*, 501 U.S. at 730.

For example, under Ohio law, all claims that were known, or should have been known at the time of trial or direct appeal, must be raised on direct appeal from the judgment of conviction.  Ohio provides an avenue of relief, namely post-conviction review, for those claims that were unknown, or could not reasonably have been known, to the defendant until after the judgment of conviction.

Ohio's post-conviction relief statute, Ohio Rev. Code Ann. § 2953.21 (A), provides in pertinent part:

> Any person convicted of a criminal offense or adjudged delinquent claiming that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition at any time in the court which imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to  grant other appropriate relief. The petitioner may file such supporting affidavit and other documentary evidence as will support his claim for relief.

This statute has long been interpreted to bar post-conviction consideration of any issue that was or could have been fully litigated before conviction or on direct appeal from that conviction and was not. *See State v. Perry*, 226 N.E.2d 104, syll. ¶ 7 (Ohio 1967); *State v. Combs*, 652 N.E.2d 205 (1994). The *Perry* Court stated:

> Under the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment.

*Perry*, at syllabus ¶ 9.

Under *Perry*, res judicata has been consistently applied by Ohio state courts to bar consideration of federal claims that were not timely asserted in state court proceedings. *See, e.g., Morales v. Coyle*, 98 F. Supp. 2d 849, 860-61 (N.D. Ohio 2000). Further, this state procedural bar has routinely been observed by federal courts reviewing habeas petitions and is generally deemed an independent and adequate state ground foreclosing federal habeas review. *See, e.g., Byrd v. Collins*, 209 F.3d 486, 521 (6th Cir. 2000).[5]

---

[5]     The Supreme Court of Ohio recognized an exception to the *Perry* rule in *State v. Hester*, 341 N.E. 2d 304 (Ohio 1976). The *Hester* Court concluded that, where the

31

Returning to the issue of procedural default generally, if the district court concludes that the state prisoner has procedurally defaulted his federal claims in state court, federal review is barred unless the prisoner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749.[6]

Demonstrating "cause" requires showing that some factor external to the defense impeded counsel's efforts to comply with the State procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Demonstrating "prejudice" requires showing a disadvantage "infecting" the trial with constitutional error. *United States v. Frady*, 456 U.S. 152, 168 (1982).

---

record does not disclose that the issue of competent trial counsel has been adjudicated, *res judicata* is an improper basis upon which to dismiss an Ohio post-conviction petition. *Id.* at syllabus para. 2. The Ohio Supreme Court subsequently modified the *Hester* exception to the *Perry* rule in *State v. Col*e, 443 N.E.2d 161 (Ohio 1982), finding that:

> Where the defendant, represented by new counsel upon direct appeal fails to raise therein the issue of competent trial counsel, and said issue could fairly have been determined without resort to evidence outside the record, *res judicata* is a proper basis for dismissing defendant's petition for post-conviction relief.

*Id.* at syllabus. These modifications to the *Perry* rule have led federal habeas courts to conclude that Ohio's post-conviction statute, upon which *Perry* rests, satisfies due process. *Morale*s, 98 F. Supp. 2d at 861.

[6]     The United States Supreme Court reaffirmed this requirement in *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citations omitted):

> Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice," . . . or that he is "actually innocent."

32

Absent cause and prejudice, federal courts may not review issues that are procedurally defaulted unless the petitioner shows that his conviction is the result of a fundamental miscarriage of justice. A fundamental miscarriage of justice is a conviction of one who is "actually innocent." *See Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 496. The Supreme Court requires the petitioner to demonstrate not merely a reasonable doubt in light of new evidence, but rather that "it is more likely than not that no reasonable juror would have convicted [the Petitioner] in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The Petitioner fails to meet his burden if "unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."[7] *Id.* at 329.

## IV. GROUNDS FOR RELIEF

A.       *Trial Court Error*

---

[7]        In ascertaining whether a state court has addressed the merits of a petitioner's constitutional claim, federal courts must rely on the presumption that there is no independent and adequate state ground for the state court decision absent a clear statement to the contrary. *Morale*s, 98 F. Supp. 2d at 862 (citing *Coleman*, 501 U.S. at 735). Applying this presumption, the Sixth Circuit has established a four-step analysis to determine whether a claim has in fact been procedurally defaulted. *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986). The Court must determine (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state courts actually enforced the state procedural sanction; (3) whether the state procedural bar is an "adequate and independent" state ground on which the State can foreclose federal review; and (4) if the above are met, whether the petitioner has demonstrated cause and prejudice, or a fundamental miscarriage of justice. *Id.* In determining whether a state court rested its holding on procedural default so as to bar federal habeas review, the Court must look to "the last explained state-court judgment." *Combs v. Coyl*e, 205 F.3d 269, 275 (6th Cir. 2000). *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir.1991) (quoting *Ylst v. Nunnemake*r, 501 U.S. 797, 805 (1991)).

33

In claims 1, 2, 3, 5, 9, 14, 21, 22, 25, 30, 31, 33, 34, 35, 36, 43, and 44, Montgomery argues that various acts of trial court misconduct deprived him of a fair trial.

1. Juror Bias

In claims 1, 3, and 14, Montgomery claims his constitutional rights were violated because several jurors were biased against him.

In determining whether a juror is biased, the habeas court must give deference to the trial judge who sees and hears the juror, and the trial court's finding of juror impartiality is entitled to a presumption of correctness. *Bowling v. Parker*, 344 F.3d 486, 519 (6th Cir. 2003).  In reviewing the trial court's decision, the question is not whether the trial judge's conclusion of impartiality was right or wrong, but whether the decision was fairly supported by the record.  *Id.*

> 3.[8]    *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to excuse for cause two jurors who were biased against him.*

> 14.[9]    *Petitioner's conviction and sentence are in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that two of the jurors who convicted him and sentenced him to death were acquainted with police officers who testified at his trial.*

In this case, Montgomery argues that Jurors Zolg and Bader should have been dismissed for cause because they could not afford Montgomery the presumption of innocence.[10]  Montgomery also

---

[8]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[9]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[10]    Montgomery later removed Zolg and Bader by peremptory challenge.  As Montgomery did not exhaust all of his peremptory challenges (T. 1101) and makes no argument that his jury "as a whole" was not impartial, he may not claim error in the trial court's refusal to dismiss them for cause.  *See, e.g.*, *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988).  Ohio has a similar rule.  *See State v. Broom*,

challenges the trial court's refusal to remove Jurors Thomas and Del Brocco because they knew, respectively, Police Officers Ragans and Goetz, who testified briefly at trial. Jurors Zolg, Bader, Thomas, and Del Brocco ultimately all indicated their ability to set aside their impressions or opinions and to fairly and impartially consider the case on the evidence presented and law as instructed by the trial court.  (Tr. 823-833, 1030-1031, 1070.)  The trial judge's determination of a jury's impartiality is a finding of fact subject to deference in federal habeas corpus absent clear and convincing evidence otherwise.  *Patton v. Yount*, 467 U.S. 1025, 1031 (1984). Montgomery offers no evidence to rebut the jurors' assertion of their ability to follow the law as provided by the trial court and to decide the case based only on the trial evidence.

There was thus no error in the trial court's refusal to remove them for cause.  *See, e.g.*, *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002).

> 1.[11]   *Petitioner was denied his right to a fair trial by an impartial jury in a capital case, as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution by the trial court's failure to excuse an obviously biased and incompetent juror.*

Montgomery argues that Juror Lukasiewicz[12], who was seated on the jury without challenge, should have been removed for cause as incompetent to serve as a juror. During the penalty phase, Montgomery presented two witnesses to establish the existence of mitigating factors; one of those witnesses was Dr. Gerald Briskin, a psychiatric expert. Immediately after the jury retired to deliberate on Montgomery's sentence, Juror Lukasiewicz sent the following note to the trial judge:

---

40 Ohio St. 3d 277, 287-88 (1988).

[11]   This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[12]   Juror Lukasiewicz died in a traffic accident September 3, 2000.

35

> Dear Judge Abood, After I saw Dr. Briskin [Montgomery's psychiatric expert] on the stand, I decided I should ask you if I am allowed to be a juror because I am a psychiatric patient, and early in 1964 I had a dream after shock treatments.  I saw Dr. Briskin in a dream.  He was fat, carried a briefcase and a clock.  I thought he looked like Satan.  I never recall having seen this man in person.

(Tr. 2317)

With the parties' agreement, the judge had Ms. Lukasiewicz brought to his conference room

and the following proceedings were had:

| | |
|---|---|
| THE COURT: | If you'll have a seat for a minute, please. |
| MS. LUKASIEWICZ: | Let me see if I have the year on that correct.  Is that 1964? |
| THE COURT: | 1964, yes.  When I read your note, it became necessary for the record of these proceedings for counsel, all the attorneys to see it, and for it to become a part of the record.  The law requires this.  I know that you gave it just to me, but legally there was no way I could keep it a secret. |
| MS. LUKASIEWICZ: | Well, I didn't know whether it was important or not -- |
| THE COURT: | Yes, well -- |
| MS. LUKASIEWICZ: | – because this was just a dream. |
| THE COURT: | Well, I'm apologizing to you for showing a note you sent to me, showing it to the others. |
| MS. LUKASIEWICZ: | Well, if it is important, I realize that. |
| THE COURT: | Well, we're now going to find out if it's important.  And, so, but, first of all, please understand that that's why I didn't keep it in confidence to myself.  It was necessary that I – we place it on the record and I show it to the other attorneys. |
| THE COURT: | I have one question to ask you. |
| MS. LUKASIEWICZ: | Uh-huh. |
| THE COURT: | And that question is, considering, as you will recall, all the questions that were asked during the jury selection process, and considering all of the evidence that you've heard over all of these days, during the first trial and during this hearing we've had today, and considering the instructions of law that I have just given to you |

36

|                    | and the rest of your fellow jurors, can you consider the case fairly -- |
|--------------------|------------------------------------------------------------------------|
| MS. LUKASIEWICZ:   | Well -- |
| THE COURT:         | – and impartially? |
| MS. LUKASIEWICZ:   | Well, the way -- |
| THE COURT:         | If you'll just answer the question yes or no? |
| MS. LUKASIEWICZ:   | Well, we just talked, and we have to weigh the -- |
| THE COURT:         | Can you consider -- |
| MS. LUKASIEWICZ:   | Yes, I can.  I can consider it by weighing, I believe.  I just read there were seven articles in there that we have to weigh. |
| THE COURT:         | It is important that you just think about my question. |
| MS. LUKASIEWICZ:   | Yes or no. |
| THE COURT:         | Can you consider the question that is before you and the rest of the jurors fairly and impartially in light of what you have told me here? |
| MS. LUKASIEWICZ:   | I don't know, I mean, I told you when I became – you know, when you interviewed me the first time that I had been a psychiatric patient at one time.  And that – that is why, I mean, I don't know the man.  I've never seen him before and -- |
| THE COURT:         | Would -- |
| MS. LUKASIEWICZ:   | I have nothing, I mean, you know, considering I've never seen this man before until I saw him there and then I remember him from a dream, because I have a report, you know, that I – I did have an appointment with my psychiatrist during the time that I've been here now, you know. |
| THE COURT:         | Okay.  Just let me ask you, would what – the matter that you have reported to me in the note -- |
| MS. LUKASIEWICZ:   | Uh-huh. |
| THE COURT:         | – would that affect your consideration of the case in such a way -- |
| MS. LUKASIEWICZ:   | No. |
| THE COURT:         | – that you could not be fair and impartial? |
| MS. LUKASIEWICZ:   | No, not when you use the word effect. |
| THE COURT:         | Would it have any effect? |
| MS. LUKASIEWICZ:   | No because I – this – this is in the past, 20 years ago this happened. |
| THE COURT:         | Okay. Then would it – would what you have reported to me in this note have any effect on |

|                     | your consideration of the matter that is before the jury now? |
| MS. LUKASIEWICZ:    | No, no. |
| THE COURT:          | Okay, Very good.  You'll be taken back to the jury room, then, and the jurors will be instructed to proceed with their deliberations.  Thank you very much. |
| MS. LUKASIEWICZ:    | Uh-huh. |

(Tr. 2322-2326)

The Ohio Supreme Court found no error:

> Appellant suggests that Juror Lukasiewicz was unqualified to sit as a juror due to "exhibited bias" and "abnormal reasoning."   We have reviewed juror Lukasiewicz's responses to the questions asked of her both before trial and during the penalty phase.  We find that Juror Lukasiewicz adequately responded to these questions and that her statements indicate her ability to distinguish between her dreams on the one hand and reality on the other hand.   Nothing in the record affirmatively establishes that juror Lukasiewicz was biased.   Under these circumstances, we find no abuse of discretion and, hence, appellant's second proposition of law is not persuasive

*Montgomery*, 61 Ohio St. 3d at 417. This court agrees with that determination.

In sending Judge Abood the note about her dream, Juror Lukasiewicz presented the court with evidence of her own possible bias.[13]  When faced with an allegation of juror bias before a verdict is entered, the question is "did [the] juror swear that [s]he could set aside an opinion [s]he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).  In this case, the trial judge acted correctly.  Upon learning of possible juror bias, Judge Abood correctly questioned Juror Lukasiewicz about her twenty-year-old dream to determine whether Juror Lukasiewicz could set aside that dream and render

---

[13]     Montgomery's suggestion that Juror Lukasiewicz biased the entire jury by disclosing this information to other jury members is not borne out by juror affidavits after the trial took place. (*See, e.g.*, Post-conviction Ex. CC-EE.)

38

a verdict solely on the evidence presented at trial.  In that hearing, Juror Lukasiewicz demonstrated that she knew the difference between a dream and reality and that she could indeed set aside her dream and determine the case solely on the evidence presented at trial.  Judge Abood believed her and found that Juror Lukasiewicz was impartial.  Judge Abood's finding that Juror Lukasiewicz could impartially judge Montgomery's case solely on the trial evidence is a factual determination entitled to 28 U.S.C. § 2254(e)'s presumption of correctness, overturnable only by clear and convincing evidence to the contrary.  *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (citing *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) and *Hill v. Brigano*, 199 F.3d 833, 843 (6th Cir. 1999)).  As Montgomery offers no "clear and convincing" evidence that Juror Lukasiewicz could not or did not remain impartial during the sentencing phase of Montgomery's trial, the court denies this claim for relief.

### 2.  Jury Qualification

2.[14]   *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court excluded, for cause, jurors based on their views about capital punishment.*

5.[15]   *Death qualification of the jury that convicted and sentenced him to death denied Montgomery of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

Montgomery's second and fifth claims for relief challenge the trial court's exclusion of Jurors Gorsuch, Watson, Barto, Faison, Neuhausell, Serke, Reinstein, Wilde, and Sudduth based on their views about capital punishment.

---

[14]   This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[15]   This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the United States Supreme Court held that the state cannot exclude persons from a jury for expressing opposition to the death penalty.  In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court clarified *Witherspoon*, and affirmed the standard set forth in *Adams v. Texas*, 448 U.S. 38, 45 (1980) for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment.  "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424.[16]  The standard does not require that a juror's bias be proved with "unmistakable clarity."  467 U.S. at 424.  In so ruling, the Court recognized a presumption of correctness must be accorded a trial court's finding regarding a prospective juror challenge for bias:

> The trial court is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from "factual issues" that are subject to Section 2254(d).

*Id.* at 429.

During voir dire, each of the prospective jurors excused indicated that their views on the death penalty would "prevent or substantially impair the performance of their duties in accordance with their instructions and oath."[17]  (Tr. 87-90, 259-261, 435-438, 449-455, 560-562, 654-666, 691-693, 715-716, and 808-809).  Under *Witt*, therefore, the trial judge would have erred in seating those jurors in Montgomery's case.  The state court's determination was not clearly contrary to established

---

[16]     Ohio law follows this rule.  *See, e.g.*, *State v. Montgomery*, 1988 WL 84427 *5 (Ohio Ct. App. Aug. 12, 1988) (citing *State v. Scott*, 26 Ohio St. 3d 92, 97 (1986)).

[17]     Prospective juror Faison knew Montgomery.  (T. 445.)

40

federal law as determined by the United States Supreme Court nor an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §2254(d); *Witt*, 469 U.S. at 424. This claim of error must therefore be denied.

3. Instructions

21.[18]   *Petitioner's convictions and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to adequately admonish the jury before capital trial.*

22.[19]   *Petitioner's convictions and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to properly instruct the jury at the guilt phase of the trial.*

34.[20]   *Petitioner's convictions and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court refused to answer the jury's request for additional instructions.*

For habeas corpus relief to be warranted on the basis of an incorrect jury instruction, a petitioner must show more than that "the instruction is undesirable, erroneous, or even universally condemned," and that, taken as a whole, it is so infirm that it rendered the entire trial fundamentally unfair. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Hardaway v. Withrow*, 305 F.3d 558, 565 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001).

---

[18]   This claim was properly preserved for habeas review. The Respondent does not argue otherwise.

[19]   This claim was only partially preserved for habeas review. Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred. It did not.

[20]   This claim was properly preserved for habeas review. The Respondent does not argue otherwise.

41

The Sixth Circuit held that "[a] district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense."  *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002) (quoting *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)).  Thus, "only if 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' can [the federal habeas] court grant a writ."  *Baze v. Parker*, 371 F.3d 310, 327 (6th Cir. 2004) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).  The Supreme Court noted in *Estelle* that "we also bear in mind our previous admonition that we have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Despite this difficult standard of review, a jury instruction will not withstand scrutiny if it submits alternative theories for the jury to convict, one of which is permissible and the other unconstitutional, and the reviewing court cannot determine on which theory the jury relied. *Zant v. Stephens*, 462 U.S. 862, 880-83 (1983); *Bachellar v. Maryland*, 397 U.S. 564, 571 (1970); *Stromberg v. California*, 283 U.S. 359, 369-70 (1931); *United States v. Palazzolo*, 71 F.3d 1233, 1235-38 (6th Cir. 1995). *Compare Griffin v. United States*, 502 U.S. 46, 56 (1991) (general jury verdict is valid if sufficient evidence supports one of the grounds for conviction, so long as the other submitted grounds are neither illegal nor unconstitutional, but merely unsupported by the evidence) and *United States v. Mari*, 47 F.3d 782, 785-86 (6th Cir. 1995) (same; Sixth Circuit Pattern Jury instruction on deliberate ignorance is harmless error) *with United States v. Henning*, 286 F.3d 914, 921-22 (6th Cir.

42

2002) (facts of the case made it clear that the jury likely convicted based on an erroneous instruction).

An instruction is also invalid if it can be viewed by the jury as shifting the burden of proving an element of the case onto the defendant, as when it instructs the jury to presume that a person intends to commit the natural, ordinary, and usual consequences of his voluntary actions, *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979), or to presume malice from either an unlawful act or from the use of a deadly weapon, *Yates v. Evatt*, 500 U.S. 391, 401-02 (1991); *Caldwell v. Bell*, 288 F.3d 838, 843 (6th Cir. 2002); *Houston v. Dutton*, 50 F.3d 381, 385-86 (6th Cir. 1995). If an instruction is ambiguous and not necessarily erroneous, it can run afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72, 73 n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990). When faced with a *Sandstrom* error, the court should not assume it is harmless but must review the entire case under the *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), harmless error rule, as with any constitutional error on habeas corpus review. *Caldwell v. Bell*, 288 F.3d 838, 842 (6th Cir. 2002). Nonetheless, instructional errors of state law will rarely form the basis for federal habeas corpus relief. *Gilmore v. Taylor*, 508 U.S. 333, 344 (1993); *Estelle*, 502 U.S. at 71-72. Where a jury instruction misdescribes an element of a crime, the state court of appeals must use the standard test of harmless error. *California v. Roy*, 519 U.S. 2, 5-6 (1996). Similarly, an instruction that omits an essential element is not per se prejudicial error. *Neder v. United States*, 527 U.S. 1, 8-11 (1999). *But see United States v. Monger*, 185 F.3d 574, 578 (6th Cir. 1999) (failure to instruct on a lesser included offense is a structural error requiring reversal).

43

In these claims, Montgomery argues that certain instructions given (or not given) by the trial judge violated his right to due process. In particular, Montgomery argues there he was deprived of his right to due process by: (1) the failure of the trial court before trial to admonish the jury to avoid press coverage or conversation with others; (2) the admonition to the jury that use of deadly weapon could imply the purpose to cause death; (3) the failure of the trial court to instruct on lesser included offenses of voluntary and involuntary murder; and (4) the failure of the trial court to re-instruct the jury at the request of a juror. This court disagrees.

> (a)    *Admonishment of the jury*

Regarding the trial judge's failure to admonish potential jurors to avoid press coverage and conversations with others during voir dire, the Ohio Supreme Court ruled as follows:

> On the first day of testimony, the trial judge instructed the jury to avoid media accounts of the trial.[]   In his twenty-third proposition of law, appellant contends that this instruction represents a failure of the trial court to adequately instruct the jury to avoid potentially prejudicial media accounts of the court's proceedings.   Appellant contends that during the voir dire, the potential jurors were not instructed to avoid media accounts of the proceedings and, thus, the jurors were not impartial or indifferent.

> In *Warner v. State* (1922), 104 Ohio St. 38, 44, 135 N..E.. 249, 251, we stated that " * * * in criminal cases it is not so much a question of what prejudice might be inferred from irregularities, omissions and technical errors, but rather a question [of] what error has probably intervened as shown by the record."   In the instant case, appellant has failed to put forward evidence suggesting that any juror accessed prejudicial information between the voir dire and the first day of trial, when the jury was instructed as to media coverage.   Moreover, despite the fact that several jurors acknowledged exposure to media coverage, these same jurors indicated that they could make an impartial evaluation of the evidence. Therefore, we find that appellant's constitutionally guaranteed right to a trial by an impartial jury was not jeopardized.

This ruling is neither contrary to nor an unreasonable application of United States Supreme Court precedent.  The trial court thoroughly questioned each juror seated about their exposure to

44

prejudicial information.[21]  This is thus unlike the case of *Beck v. Washington*, 369 U.S. 541 (1962) where a "judge impaneling [a] jury had breached his duty to ascertain on voir dire whether any prospective juror had been influenced by the adverse publicity and that this error had been compounded by his failure to adequately instruct the jury concerning bias and prejudice." *Id.* at 545. In this case, the judge both faithfully warned jurors before each break to avoid media and other information about the case, and through searching voir dire, determined what, if any, information prospective jurors knew of the case.  (*E.g.,* Tr. 22, 34, 50, 112-13, 797-98.)

---

[21]    For example, the Judge asked Juror Thompson:

> Very good. Now, one other question.  The case has received some publicity throughout our local newspaper, radio, and television. Therefore, I must ask if you recall from what I have described to you so far – reading about the case or listening to any reports on the radio or television when it was first reported or up until this time?"

(Tr.  22.)  On the first day of trial, the Judge addressed the jury pool:

> Now, I'm going to repeat some things now that you've already heard, but is very important that you remember this at all times. And this is probably going to be one of the most difficult assignments that you're going to have.  And that is, that you are not to discuss the case amongst yourselves or with anyone else during the course of the trial.  You are not permitted to allow anyone to discuss it with you or in your presence.  Now, this is a problem because you are going to be involved here for a considerable period of time.  And when you go home, or if you're with other people socially, as soon as they find out that you're seated on this jury, they're going to want to here [sic] all about it.  But you have taken an oath, and it is your sworn duty to follow these instructions.  And, so, you will simply have to tel the folks at home or the folks that you're in contact with that you are under an order that you must follow, and that you cannot discuss the case with anyone.

(Tr. 1155-1156.)

45

The court therefore denies this sub-claim for relief.

    *(b)      Implication of purpose to cause death by use of a deadly weapon*

This sub-claim was also addressed by the Ohio Supreme Court and found wanting:

> In the guilt phase, the trial court instructed the jury on the element of "purpose."   In his twentieth proposition of law, appellant contends that the trial court's instruction was in error.  With respect to the element of purpose necessary to sustain a conviction of aggravated murder or murder, appellant contends that the instruction "created an unconstitutional conclusive presumption * * *."   Judge Abood's instruction to the jury was:
>
> > "The purpose with which a person does an act is determined from the manner in which it is done, the means used, and all other facts and circumstances in evidence.
> >
> > "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon."
>
> Appellant asserts that this instruction is unconstitutional because the trial judge used the word "inferred" without adding a qualification that such an inference must be non-conclusive.
>
> In *Sandstrom v. Montana* (1979), 442 U.S. 510 . . . the United States Supreme Court defined a conclusive presumption as an "irrebuttable direction" to the jury to find intent upon proof of the defendant's voluntary action.  Id. at 517 . . . Thus, a conclusive presumption unconstitutionally shifts the burden of persuasion to the defendant to disprove an element of the crime charged. Id.  In the instant case, appellant argues that the jury's instruction contained a conclusive presumption which relieved the state of having to establish the material element of criminal intent.  We do not agree.   The fact that the words "may be" modify the word "inferred" in the trial judge's instruction to the jury supports such a conclusion.  No reasonable jury could have felt compelled to presume intent on the basis of the trial judge's instruction.   Therefore, the instruction was not a conclusive presumption.

61 Ohio. St. 3d at 414-15.  This court agrees that the words "may be" sufficiently qualify "inferred" to remove it from the realm of a conclusive presumption and thus render the instruction constitutional.  *Cf. Sandstrom*, 442 U.S. 510, 513 (1979) ("[t]he law presumes that a person intends the ordinary consequences of his voluntary acts.").  The court therefore denies this sub-claim.

*(c)*     *Lesser included offenses (voluntary and involuntary manslaughter)*

In *Beck v. Alabama*, 447 U.S. 625 (1980), the United States Supreme Court held that it is unconstitutional to impose the death penalty when a "jury [is] not permitted to consider a verdict of guilt of a lesser included non-capital offense, when the evidence would have supported such a verdict." *Beck*, 447 U.S. at 627.  In *Beck*, the defendant and his accomplice broke into the house of an 80-year-old man.  During the ensuing robbery, they tied up the elderly man and, according to Beck, the accomplice struck the man and killed him.  Beck consistently maintained that he did not kill the victim, nor had he ever intended for the murder to occur.  In holding that the denial of an instruction on the lesser-included offense violated Beck's constitutional rights, the Court focused on the accuracy of the fact finding process.  A crucial element of the crime for which Beck was convicted was the element of intent -- Beck's intent was very much in dispute at trial.  The Court found that the accuracy of the fact finding process was placed in doubt when the jury was denied the opportunity to consider the lesser-included offense of felony murder, which did not require intent. Under these circumstances, the Court reasoned, jurors are more likely to convict a defendant of aggravated murder despite their doubt as to intent because of their abiding conviction that the defendant did *something* wrong.  Two years later, in *Hopper v. Evans*, 456 U.S. 605 (1982), the Court reaffirmed but restricted the holding of *Beck*.  Evans had been convicted of robbery-intentional murder.  During his grand jury testimony, Evans testified that the victim "was not the only person he had ever killed, that he felt no remorse because of that murder, that he would kill again in similar circumstances, and that he intended to return to a life of crime if he was ever freed." *Evans*, 456 U.S. at 607.  The Court held that Evans was not constitutionally entitled to a lesser-included instruction because the evidence did not support a verdict on the lesser charge and there was insufficient

47

evidence to support a rational jury's conclusion that he should have been acquitted of robbery-murder.  Because "[t]he evidence not only supported the claim that respondent intended to kill the victim, but affirmatively negated any claim that he did not intend to kill the victim," the Court held that the absence of the lesser-included offense did not compromise fact finding as in *Beck* where the element of intent was vigorously contested.  *Evans,* 456 U.S. at 613; *Beck*, 447 U.S. at 634.  According to *Evans* then, a *Beck* instruction is only required when "there was evidence which, if believed, could reasonably have led to a verdict of guilt of a lesser offense" but not the greater.  *Id.*

In this case, the evidence showed that Montgomery, seemingly without reason, separately and at close range shot and killed two girls he lured away from their home to give him a ride home.  There was no evidence, nor any suggestion, that the shootings were accidental or provoked that could lead to a verdict on a lesser charge.  To the contrary, the facts of this case suggest initial and continued intent to kill both girls. Under these circumstances, the trial judge was under no obligation to instruct the jury on voluntary or involuntary manslaughter.  *See, e.g., Evans*, 456 U.S. at 612.

*(d)      Failure to respond to juror's request for additional instructions.*

In an affidavit signed six years after the jury's sentencing decision in this case, Juror Sidney Thomas averred:

> 6.      A number of the jurors, including me, were very confused by the instructions given by the judge.  I sent a note to the judge asking for an explanation, however the judge did not answer my question.

> 7.      I believed in October, 1986, that William Montgomery could be rehabilitated.

(Post-conviction Petition Exh. FF.)  According to Montgomery, the trial court did not respond.  According to the Attorney General, "[t]he trial court then properly responded that the jury must make its decision on the instructions previously provided," (ROW 148) which included an instruction that

48

the jury consider "[a]ny other factors that are relevant to the issue of whether the defendant should be sentenced to death."  (Tr. 2313.)  The trial record is silent as to what occurred.  However, assuming, without deciding, that such a note was passed to the judge and the judge did not respond in any way, the failure to give the requested instruction must have infected and invalidated the entire trial to establish a  due process violation warranting habeas relief.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

Absent evidence to the contrary, it is presumed that juries follow the law as instructed by the trial court.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Where it is alleged that the trial court failed to give an instruction, the petitioner's burden is "especially heavy" because "an omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law."  *Henderson,* 431 U.S. at 155.  An instruction or requested instruction is not viewed in isolation but in the context of the overall charge.  *Spivey v. Rocha*, 194 F.3d 971, 976 (9th Cir. 1999).

In this instance, a review of the entire charge to the jury given prior to the commencement of penalty phase deliberations demonstrates that the trial court clearly and properly instructed the jury as to the specific factors it was permitted to consider in mitigation.  Further clarification was unnecessary.  As Montgomery has not demonstrated the "likelihood" of jury misinterpretation of the correct instructions given, *Weeks*, 528 U.S. at 234, or that the failure to provide a clarification infected and invalidated the entire process, the court dismisses Montgomery's claim for relief.

> 33.[22]   *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth,
> and Fourteenth Amendments to the United States Constitution
> because the trial court improperly instructed the jury at the mitigation
> phase of the trial.*

In this claim, Montgomery raises a number of mitigating instructions that he claims violated

his due process rights. In particular, Montgomery takes issue with:

> a.    *the judge's instructions that if the jury found that no mitigating factors exist or that
> the aggravating circumstances outweighed the mitigating factors, then it must
> sentence Montgomery to death (i.e, the Ohio Death Penalty is mandatory) (Tr. 2321.)*

This claim has been raised in earlier cases and found wanting, *see, e.g., Blystone v.*

*Pennsylvania,* 494 U.S. 299 (1990), and is a correct statement of Ohio death penalty law.

> b.    *that outweigh meant "weigh more than" (Tr. 2113-214).*

This claim is likewise without merit.  *See, e.g., Cooey v. Coyle*, 289 F.3d 882 (6th Cir.

2002).

> c.    *that their decision to sentence Montgomery was merely a "recommendation."*

This also is a correct statement of Ohio law and has been upheld as constitutional in *Mapes*

*v. Coyle,* 171 F.3d 408, 414-15 n.2 (6th Cir. 1999).

> d.    *that the jury should consider all seven mitigating factors, that to avoid a death
> sentence, all twelve jurors must reject it and impose a life sentence (Sentencing Tr.
> 4.)*

---

[22]    This claim was only partially preserved for habeas review.  Nevertheless and in
an abundance of caution, the court reviews the claim on its merits to ensure that
no miscarriage of justice occurred.  It did not.

In this claim, Montgomery contends that the trial court unconstitutionally charged the jury that it must first unanimously reject a death sentence before unanimously imposing one of two life sentences.  This type of instruction has been one of much debate both in this court and in the Sixth Circuit Court of Appeals.  *See, e.g. , Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003); *Roe v. Baker*, 316 F.3d 557 (6th Cir. 2002); *Scott v.  Mitchell*, 209 F.3d 854 (6th Cir. 2000); *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998); *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999).  Most recently, the Sixth Circuit has found that a jury instruction constitutionally infirm because the court found it to be an "acquittal-first" instruction, *i.e.*, an instruction "which requires the jury to unanimously reject a death sentence before considering other sentencing alternatives."  *Spisak v. Mitchell*, 465 F.3d 684, 709 (6th Cir. 2006).  The *Spisak* court held that the instruction the trial court provided prior to the sentencing phase of the petitioner's trial may have required the jury to unanimously find the presence of  mitigating factors in violation of the United States Supreme Court's holding in *Mills v. Maryland*, 486 U.S. 367 (1988).  *Id.* at 708.  Coupled with the verdict form, which required all twelve jurors to sign whatever verdict they reached, the "acquittal-first" instruction in the *Spisak* case "'would' lead a reasonable juror to conclude that the only way to get a life verdict is if the jury unanimously finds that the aggravating circumstances do not outweigh the mitigating circumstances, an entirely different instruction from one that clearly informs the jurors that a life verdict can be rendered by a jury that has not first unanimously rejected the death penalty."  *Spisak*, 465 F.3d at 710.

The instruction the trial court provided the jury here did not require the jury to first unanimously reject a death sentence.  Instead, the trial court informed the jury regarding its responsibilities under the law.  It stated,

51

> "You shall recommend the sentence of death if you unanimously - - that is, all twelve of you - - find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors."

(*Sentencing Tr.* at 2315.)  The trial court then went on to state that if all twelve jurors did not agree that the State had carried its burden of proof, then the jury must unanimously and consider and find which two life sentences would be appropriate. *Id.*  Thus, unlike in *Spisak*, the trial court here did not require the jury to first "acquit" Montgomery of the death penalty.  It merely informed them that if they could not all agree on a death sentence, then they must consider and unanimously find which life sentence was appropriate.  There is no language in this instruction that would imply that the jury was required to unanimously find each mitigating factor, as was the issue in *Mills*.  This sub-claim is not well-taken.

> e.    *that "reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge" (Tr. 2314.)*

This claim is also counter to well established law.  *See, e.g., Coleman v. Mitchell*, 268 F.3d 417, 436-37 (6th Cir. 2001).

The court sees no reason to deviate from these earlier rulings and therefore dismisses this claim.

> 25.[23]   *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the jury considered the absence of mitigation as an aggravating factor.*

---

[23]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

A thorough review of the trial record (including juror affidavits Exh. CC-HH to the post-conviction petition) fails to disclose that the jury considered the absence of mitigating evidence to be an aggravating factor.

This claim must therefore be dismissed as lacking support.

4. Miscellaneous Trial Court Error

> 9.[24]    *Petitioner's sentence of death violates the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because a complete record of all of the proceedings was not maintained and the appellate review was done from an incomplete record.*

In this claim, Montgomery argues that his rights were violated when the court failed to record his grand jury and arraignment proceedings.  When a petitioner argues a failure to maintain a complete record violates his rights, he must allege what would have been shown had the record been made and how he was prejudiced by the court's failure to maintain a complete record. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1458 (10th Cir. 1995).  This Montgomery has not done.  The court must therefore dismiss this claim.

> 30.[25]    *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because he was not permitted a continuance between the guilt and mitigation phases of the trial.*

---

[24]    This claim was only partially preserved for habeas review.  Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

[25]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

Granting a continuance depends on the particular facts of the case. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1961). A court will not presume prejudice from the fact that defense counsel had only a short time to prepare for trial proceedings. *United States v. Cronic*, 466 U.S. 648, 661-62 (1984). Granting a motion for continuance is within the sound discretion of the trial judge. *Wilson v. Mintzes*, 761 F.2d 275, 281 (6th Cir. 1985). Courts look for a showing of prejudice or that a continuance would have added something to the defense. *United States v. Faulkner*, 538 F.2d 724, 729-30 (6th Cir. 1976).

> No absolute rule can be articulated as to the minimum amount of time required for an adequate preparation for trial of a criminal case. Thus we look for a showing from the defendant of prejudice, i.e., a showing that the continuance would have made relevant witnesses available, or would have added something to the defense.

*Id.*

Montgomery has shown no prejudice in this case. The best that he can suggest is that the pre-sentence investigation report was finished just before the penalty phase began, but he fails to suggest what difference this would have made. He has not identified a single error or explained how more time would have helped counsel. Moore, 419 F.2d at 811. Counsel had ample time to develop a mitigation plan during the pretrial period. The claim must therefore be denied.

> 31.[26] *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the trial court improperly considered non-statutory aggravating circumstances, ignored relevant mitigating factors, and submitted an inadequate sentencing opinion.*

---

[26] This claim was only partially preserved for habeas review. Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred. It did not.

54

In this claim, Montgomery attacks the trial court sentencing decision. In particular, Montgomery argues that the trial court improperly considered certain non-statutory aggravating factors, i.e., his juvenile conviction for manslaughter and Dr. Briskin's opinion that rehabilitation of Montgomery was guarded at best (claim 24, *infra*), failed to consider certain mitigating factors, and failed to articulate its method of weighing aggravating and mitigating factors. There was no error.

> a. *Improper consideration of non-statutory aggravating factors*; *improper failure to consider mitigating factors*

In this sub-claim, Montgomery argues that the trial court, in its sentencing decision, improperly weighed certain "non-statutory" aggravating circumstances in sentencing Montgomery to death. In particular, Montgomery argues that the court considered Montgomery's juvenile conviction of manslaughter, Dr. Briskin's guarded prognosis for recovery, and a lack of mitigating factors as aggravating factors in his case.

Even assuming that the trial judge improperly considered those matters as aggravating circumstances in reaching its sentencing decision, in a "weighing state" like Ohio, where the sentencer must determine whether the aggravating circumstances outweigh the mitigating factors presented by the defendant beyond a reasonable doubt before the death penalty can be imposed, state appellate courts can cure weighing defects by correctly re-weighing aggravating circumstances and mitigating factors. Ohio Rev. Code Ann. § 2323.03(D)(2); *Romano v. Oklahoma*, 512 U.S. 1, 11 (1994); *Richmond v. Lewis*, 506 U.S. 40, 48-49 (1992). That is what occurred in this case. There is no indication that the Ohio appellate courts considered any of those so-called "aggravating

circumstances" in concluding that Montgomery's death sentence was appropriate and proportional. *See, e.g., Montgomery*, 61 Ohio St. 3d at 419.[27]

    *b.*    *Failure to explain its method of weighing aggravating and mitigating factors*

The Constitution does not require a trial court to articulate its method for weighing aggravating and mitigating factors. *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73, 179 (1988) (the Court has "never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.")

,, the trial court, in its sentencing instructions explained its method of weighing:

> To outweigh means to weigh more than, to be more important than.  The existence of mitigating factors does not preclude or prevent the death sentence if the aggravating circumstances outweigh the mitigating factors.

(Tr. 2314.)  This definition of "outweigh" has withstood Constitutional attack. *See, e.g., Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001).  This claim is therefore dismissed.

---

[27]    "[A]ppellant shot Ogle in the head and neck at close range during the course of an aggravated robbery.  Appellant also shot Tincher in the head at close range. Again we find the aggravating specification of which appellant was found guilty, R. C. 2929.04(A)(5) and (7), are clearly shown in the record before us.  Appellant introduced evidence on the mitigating factor that he lacked a substantial capacity to conform his conduct to the requirements of the law because of a mental disease or defect.  We find that appellant did not establish the existence of this R.C. 2929.04(B)(3) factor by a preponderance of the evidence.  Appellant presented evidence concerning his family background and violent and unstable family environment.  We conclude that these factors are entitled to some, but very little, weight in mitigation.  Additionally, we have considered the youth of appellant (he was twenty years old at the time of the offenses) and conclude that this R.C. 2929.04(B)(4) factor is entitled to some weight.  Weighing the mitigating factors against the aggravating circumstances, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt."

35.[28]   *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that it is inappropriate and disproportionate to the sentence received by his co-defendant.*

36.[29]   *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that he was denied the procedural safeguards of a meaningful proportionality review.*

A proportionality review of a death sentence is not constitutionally required.  *Pulley v. Harris*, 465 U.S. 37, 44-45 (1984).

Under Ohio Rev. Code § 2929.05 and *Ohio v. Steffen*, 31 Ohio St. 3d 111, 123-24, 509 N.E.2d 383, 394-395 (1987), Montgomery was entitled only to a comparison of his case to other cases where the death penalty was imposed.  This he received at all stages.  *See, e.g., State v. Tyler*, 1988 WL 13188 *17-18 (Ohio App. 1988); ROW Ex. 5.  As Heard was not convicted of aggravated murder, Montgomery was not entitled to have his sentence compared to that of Heard.  *See, e.g., Tyler*, 1988 WL 13188 *17-18.  Moreover, this Circuit has held that where there is some basis for disparity among the sentences of defendants with similar records found guilty of similar conduct,

---

[28]   This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

[29]   This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

uniformity of sentences is not required.  *United States v. Hill*, 1995 WL 564316 (6th Cir. Sept. 21,

1995).[30]         Claims 35 and 36 are therefore dismissed.

>    *43.[31]     Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth,
>            and Fourteenth Amendments to the United States Constitution in that the trial
>            court failed to grant a change of venue.*

In this case, Montgomery alleges that the following events impermissibly prejudiced potential

Lucas County jurors to such an extent that his constitutional right to a fair trial was compromised:

>    a.    the discovery of each of the victims' bodies led the local newscasts;
>
>    b.    during the four days between the discovery of Tincher's body and Ogle's
>          body, Ogle's parents were on television at least four times each day pleading
>          for information as to their daughter's whereabouts;
>
>    c.    the arrest of first Glover Heard and then Petitioner dominated the news;
>
>    d.    the news media avidly pursued and reported every court hearing before
>          Petitioner's trial;
>
>    e.    reporters were present in the courthouse during both the voir dire and trial;
>          and
>
>    f.    due to the inordinate media coverage, pro-capital punishment groups flocked
>          to Petitioner's trial and used it as a forum to express their views.  For
>          example, signs were carried outside of the courthouse that read, "Deb and

------

[30]    Recently, the Sixth Circuit reversed a death sentence on proportionality grounds,
        finding the disparity between the life sentence a defendant received in a murder
        for hire trial was disproportionate to the death sentence the actual killer received.
        *Getsy v. Mitchell*, 456 F.3d 575 (6th Cir. 2006).  It concluded the petitioner's
        death sentence, "while the arguably more culpable [murder for hire defendant]
        received a life sentence for the *very same* crime, violates the Eighth Amendment,
        as construed by the Supreme Court in *Furman [v. Georgia*, 408 U.S. 238 (1972)]
        and *Enmund [v. Florida*, 458 U.S. 782 (1982)], and its prohibition of arbitrary
        and disproportionate death sentences."  *Id.* at 587 (emphasis in the original).
        Because there is no evidence that Heard was the actual shooter or conspired to
        murder the girls with Montgomery, the court finds the *Getsy* holding inapposite to
        Montgomery's claim.

[31]    This claim was properly preserved for habeas review.  The Respondent does not
        argue otherwise.

Cindi are dead, now it's Montgomery's turn to die."  Also, throughout Petitioner's trial the first two rows were filled with spectators who wore buttons identifying themselves as "Mothers of Murdered Children."

In further support of his claim, Montgomery cites the following statistics:

a.  Of the twelve jurors who heard Petitioner's case, ten had read or seen the media's pervasive (and negative) coverage, (Tr. 34-36, 63, 99, 113, 173, 183-184, 230, 301-303, 332, 382);

b.  Of the three alternate jurors, two had knowledge of the case through the media; and

c.  Of the entire seventy-nine member venire, fifty-seven knew of the case from media coverage, while only ten claimed not to have been exposed.  Indeed 12 of the venire were excused for cause before having been asked about media exposure.

In cases involving pretrial publicity, "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. 1025, 1035 (1984).  It is sufficient "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dow*d, 366 U.S. 717, 723 (1961).  A federal court's ability to review voir dire proceedings in state court is limited to "enforcing the commands of the United States Constitution." *Mu'Min v. Virgini*a, 500 U.S. 415, 422 (1991).  In that case, the Court determined that while a trial court may question potential jurors about their exposure to pre-trial publicity, the court need not inquire about what media coverage each had viewed. *Id.* at 431. In upholding the trial court's questioning of the venire, the Court reiterated that "[a] trial court's findings of juror impartiality may be overturned only for 'manifest error,'" *Id.* at 428 (citations omitted), where there is a "pattern of deep and bitter prejudice shown to be present throughout the community." *Irwin* 366 U.S. at 727-28.  Montgomery has made no such showing here.  *Compare Irwin*, 366 U.S. at 727-28

*with Delaney v. United States* 199 F.2d 107, 114-15 (1st Cir. 1952) (court erred in denying defendant's motion for continuance until the prejudicial effect of nationwide publicity of such charges and other charges against defendant as the result of open congressional subcommittee hearings wore off).

Moreover, Montgomery cannot substantiate a claim that prejudice should be presumed. The United States Supreme Court determined that in cases where a media-run "carnival atmosphere" supplants the solemnity and dignity of a courtroom proceeding, a defendant may presume that the media attention so prejudiced his proceeding as to deny him or her due process of the law. *Sheppard v. Maxwell*, 384 U.S. 333, 355 (1966).

In *Sheppard*, the Court determined that intensive media attention both before and during the trial inherently prejudiced the trial. In that case, the Court found several instances of overzealous media reporting. This coverage included extensive media coverage and helicopter fly-overs during the jury's viewing of the crime scene, the trial court's refusal to ascertain which jurors had heard a radio broadcast in which the defendant was called a perjurer, and a newspaper account where Cleveland police contradicted the defendant's in-court testimony that police had mistreated him. *Id.* at 347-50. Upon reviewing "the totality of the circumstances," the Court determined that in light of the overwhelming media coverage of the case, as well as the fact that there had been no change of venue nor had the jury been sequestered, the Court could presume that the publicity so pervasively infected the proceeding the defendant's due process rights were denied. *Id.*

A review of the media attention this case received does not suggest that it inherently prejudiced Montgomery's trial. Unlike the unbridled media attention in *Sheppard*, Montgomery does not allege that the flurry of media, present in the *Sheppard* courtroom, occurred during his trial. As

60

he cannot show that a fraction of the media transgressions that took place in *Sheppard* occurred in his case, Montgomery's claim of bias does not warrant habeas relief.

> *44.[32]*   *Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution were violated in that he was improperly denied his right to bond*

In this claim, Montgomery argues that his constitutional rights were violated because Ohio state law provides that all criminal defendants have a right to bond, except for capital defendants "where the proof is evident or the presumption great."  His claim is meritless.

Ohio law parallels federal law which prohibits courts from assessing excessive bail in criminal cases, but likewise requires bail only in non-capital offenses.  *See, e.g.*, *Stack v. Boyle*, 342 U.S. 1, 3 (1951);  U.S. Const. Amend. VIII; 18 U.S.C. § 3142; Fed. R. Crim. P. 46 (a)(1).  Given the nature of the charges against Montgomery (double murder with aggravating circumstances), the state court did not violate the United States Constitution by concluding that there was a reasonable likelihood that if given bail, Montgomery might pose a risk to society.  18 U.S.C. § 3142.  Hence this claim must be dismissed.

**B. Prosecutorial Misconduct**

In claims 4, 6, 7, 10, 15, 16, 18, 26, and 32, Montgomery argues that various acts of prosecutorial misconduct deprived him of a fair trial.

---

[32]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

Prosecutorial misconduct must be so egregious as to deny petitioner a fundamentally fair trial before habeas corpus relief becomes available. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974); *Hamblin v. Mitchell*, 354 F.3d 482, 494 (6th Cir. 2003); *Frazier v. Huffman*, 343 F.3d 780, 791 (6th Cir.), *as amended on reh'g*, 348 F.3d 174 (2003), *cert. denied*, 124 S. Ct. 1825 (2004); *Hutchison v. Bell*, 303 F.3d 720, 750 (6th Cir. 2002); *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*). In this regard, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dept of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)); *accord Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003). Specifically, the Sixth Circuit takes into account:

> the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Hamblin*, 354 F.3d at 494-95 (quoting *Angel*, 682 F.2d at 608); *accord Frazier*, 343 F.3d at 791; *Hutchison*, 303 F.3d at 750; *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000). In habeas corpus cases, the inquiry is directed to deciding whether the state court's determination of the issue was an unreasonable application of clearly established Supreme Court law. *Frazier*, 343 F.3d at 793; *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003) (prosecutor cannot comment on a defendant's decision not to testify at trial, although he may summarize the evidence and comment on its quantitative and qualitative significance); *United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to the community conscience was cured by instructions). The giving of cautionary instructions also factors into the calculus of determining whether fundamental fairness was denied. *Serra*, 4 F.3d at 1356.

Extensive prosecutorial misconduct during trial and during closing argument justifies the granting of a writ of habeas corpus. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). In *Boyle*, the court held:

> Badgering and interrupting a witness, name-calling, predicting that the defendant will lie on the stand, and stating before the jury that the defendant is in need of psychiatric help are tactics so deplorable as to define the term 'prosecutorial misconduct.' Furthermore, closing arguments that appeal to class prejudices, encourage juror identification with crime victims, or vouch for the defendant's guilt would each be deemed beyond ethical bounds. To combine all three prejudicial ploys in one argument only compounds the error.

*Id.* However, where the evidence pointing to the defendant's guilt is strong and the prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's guilt or innocence of the crime, the improper comments may be "error, but the jury would probably have returned the verdict of guilty anyway," and habeas relief is not warranted. *Hamblin*, 354 F.3d at 495.

> 4.[33]   *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the State of Ohio used its peremptory challenges to exclude individuals who expressed reservations about the death penalty.*

In this claim, Montgomery challenges the prosecutor's peremptory challenge of three jurors, Rogers, Lemle, and Hardy , based on their expressed hesitancy to impose the death penalty. The Ohio Supreme Court summarily denied Montgomery's claim. *Montgomery,* 61 Ohio St. 3d at 412-13. This court affirms denial of that claim. In *State v. Seiber*, 56 Ohio St. 3d 4, 13 (1990), the court made it clear that absent racial challenges, jurors could be peremptorily challenged for any or no reason at all. *Id.* That determination was not clearly contrary to established federal law as

---

[33]   This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

determined by the Supreme Court of the United States nor an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §2254(d); *Witt*, 469 U.S. at 424.  As Justice O'Connor pointed out in concurring with denial of certiorari in *Brown v. North Carolina*:

> Challenges for cause permit the categorical and unlimited exclusion of jurors exhibiting an inability to serve fairly and impartially in the case to be tried, as noted in [*Witt*]. . . . Peremptory challenges are limited in number. Each party, the prosecutor, and the defense counsel, must balance a host of considerations in deciding which jurors should be peremptorily excused.  Permitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges simply does not implicate the concerns expressed in *Witherspoon*.
>
> Outside the uniquely sensitive areas of race the ordinary rule that a prosecutor may strike a juror without giving any reason applies.  Because a juror's attitudes towards the death penalty may be relevant to how the juror judges, which, as a matter of law, his race is not, this case is not like *Batson* [*v. Kentucky*, 476 U.S. 79 (1986).]

479 U.S. 940, 941 (1986).

In denying Montgomery's fourth claim of error, this court adopts the reasoning of Justice O'Connor and the Fourth Circuit Court of Appeals in *Brown v. Dixon*, 891 F.2d 490, 496-98 (4th Cir. 1989), that outside the limited areas of traditionally protected classes of individuals, a prosecutor is free to use its peremptory challenges to purge a jury of veniremen not otherwise excusable for cause under *Witherspoon*, *Witt*, and progeny.  In short, there is no constitutional prohibition against prosecutors using their peremptory challenges to exclude scrupled jurors, who have otherwise indicated their ability to serve and follow the law as given, from a capital jury.

The court denies Montgomery's fourth claim of error.

64

      6.[34]    *Misconduct by the prosecuting attorney in the voir dire stage of the trial proceedings deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

      7.[35]    *Petitioner was denied his right to remain silent when the prosecutor improperly commented to the jury concerning his silence in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

In these claims, Montgomery argues that the prosecution improperly

    (a)    *informed the venire that the law of felony-murder regards as irrelevant when this underlying felony took place in relation to the killing;*

This claim was rendered non-prejudicial by the trial court's correct instruction on the law of felony murder. (Tr. 2062-63: "the death must occur as part of acts leading up to or occurring during or immediately subsequent to the aggravated robbery, and that the death was directly associated with the aggravated robbery.")

    (b)    *argued to the venire the prosecutor's opinion as to what inferences could be drawn from the evidence the State intended to adduce at trial;*

This claim was rendered non-prejudicial by the trial judge's instruction that the jury was not to consider arguments of counsel as evidence.  (Tr. 2056: "The evidence does not include the indictment or the opening statements or the closing arguments of counsel  The opening statements and closing arguments are designed to assist you.  They are not evidence.")

---

[34]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[35]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

(c)     commented on his silence during voir dire and closing argument;

Montgomery claims the prosecutor made a constitutionally improper statement to the jury about his silence at the sentencing phase of the trial when the prosecutor remarked:

> And ladies and gentlemen, what is significant for you is that you haven't heard a key work by the defense in their case that would ask you to find mercy for him.  You haven't heard the word sorry.  Not even in the probation report, not in any of these psychological reports ever once hear the word sorry.

(Tr. at 2283.)  Although Montgomery did not object at trial, he now argues that the prosecutor's use of the word "heard" rather than "read," followed by a reference to the probation and psychological reports, amounts to an inference about him not taking the stand.

As the Sixth Circuit has made clear, "the prosecution cannot comment on a defendant's decision not to testify."  *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003) (relying on *Griffin v. California*, 380 U.S. 609, 615 (1965); *Rachel v. Bordenkircher*, 590 F.2d 200, 202 (6th Cir. 1978)).  Nonetheless, "prosecutors can 'summarize the evidence and comment on its quantitative and qualitative significance.'" *Bowling*, 344 F.3d at 514 (citation omitted).  "When a statement indirectly comments on the defendant's decision not to testify," *id.*, the Sixth Circuit has clearly defined the factors to be considered to determine if a constitutional error was committed:

> 1) Were the comments 'manifestly intended' to reflect on the accused's silence *or* of such a character that the jury would 'naturally and necessarily' take them as such; 2) were the remarks isolated or extensive; 3) was the evidence of guilt otherwise overwhelming; 4) what curative instructions were given and when.

*Id.* (citation omitted).

The court concludes the prosecution's statement did not create a constitutional error.  The comment was isolated and not manifestly intended to reflect on Montgomery's silence at trial.  The

66

prosecution was merely summarizing the testimony of Dr. Briskin and commenting on its quantitative and qualitative significance at the sentencing phase.  The prosecutor's words may be construed as directing the jury to review the evidence, rather than as an attempt to create an inference highlighting Montgomery's silence at trial.  Further, the comment was isolated, and there was, as the state courts found, "overwhelming evidence" of Montgomery's guilt.  *State v. Montgomery*, 1999 WL 55852 *8 (Ohio App. 6th Cir. 1999).  After analyzing the above factors, the court concludes that the comment was a  "singular, inadvertent statement[] that only . . . marginally [touched] on [Montgomery's] silence.  [It was] not intended to reflect on [Montgomery's] silence and likely [was] not taken as such."  *Bowling*, 344 F.3d at 514.  Thus, there was no constitutional error.

> (d)      *Used peremptory challenges in a racially discriminatory manner*.

This court addresses and denies this in Montgomery's twelfth claim for relief, *supra* IV.C.(12).

> 10.[36]    *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that statements were taken from him in violation of the requirements of Miranda v. Arizona, 396 U.S. 868 (1969).*

When an individual is in custody, law enforcement officials must warn the subject before interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966); *accord Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Stansbury v. California*, 511

---

[36]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless, and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

U.S. 318, 322 (1994); *United States v. Myers*, 123 F.3d 350, 359 (6th Cir. 1997); *United States v. Crowder*, 62 F.3d 782, 785-86 (6th Cir. 1995).

At issue in this claim are only statements that Montgomery made on his initial trip from his home to the Safety Building. There is no suggestion that Montgomery was not in police custody during the ride to the Safety Building or that Montgomery was not given his *Miranda* warnings until after he arrived at the Safety Building.

*Miranda* warnings, however, are not triggered by the mere placement of an individual into an officer's custody; rather, the warnings must be given before any "interrogation" begins. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003); *United States v. Hurst*, 228 F.3d 751, 759 (6th Cir. 2000). Interrogation is defined as "questioning initiated by law enforcement officials." *Miranda*, 384 U.S. at 444; *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). This definition has been extended to the "functional equivalent" of express questioning and includes, "any words or actions on the part of police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. Thus, custodial interrogation includes "words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused' . . . and therefore be reasonably likely to elicit an incriminating response." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation omitted); *see also United States v. Godinez,* 114 F.3d 583, 589 (6th Cir. 1997) (questions posed to secure personal history data necessary to complete the booking process are exempt from *Miranda's* coverage); *United States v. Soto*, 953 F.2d 263, 265 (6th Cir. 1992) (absence of intent to interrogate and exclamation of surprise are not determinative of whether interrogation was conducted; here,

spontaneous inquiry of bewilderment by police officer while inventorying arrestee's belongings did constitute interrogation).

Factors such as intervening time, removal of the prisoner to a different place, and change in identity of interrogators can render statements admissible. *Oregon v. Elstad*, 470 U.S. 298, 310 (1985); *United States  v. Daniel*, 932 F.2d 517, 519 (6th Cir. 1991). In other circumstances, if certain coercive statements by police are made, coupled with some voluntary statements by the accused, the court must decide under the totality of the circumstances whether the alleged coercion in question was sufficient to overbear the will of the accused. *See United States v. Murphy*, 107 F.3d 1199, 1205-06 (6th Cir. 1997) (low intelligence, lack of warning, and placement in police cruiser for short time are insufficient to establish coercion in this case, absent any other evidence that defendant's will was overborne).

It is important to remember that the "mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule." *United States v. Patane*, 124 S. Ct. 2620, 2628 (2004); *see also Chavez v. Martinez*, 538 U.S. 760, 772-73 (2003) (plurality opinion). "Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *Patane*, 124 S. Ct. at 2629.

In this case, Montgomery argues that the police interrogated him on the way to jail about the murders without first giving him his *Miranda* rights.  Testimony given by officers at the hearing on the motion to suppress Montgomery's statements in the police car suggests otherwise.  Montgomery was transported from his uncle's home to the Safety Building by Detective Marx and Sergeant Przeslawski.  (9/17/86 Tr. 8) Det. Marx denied questioning Montgomery about the murders either

69

at his uncle's home or anytime before Montgomery read his rights.  (9/17/86 Tr. 9-10, 21) Sgt.

Przeslawski testified as follows:

> Q.    And you served a forgery warrant on Mr. Montgomery when you met him at his uncle's house?
>
> A.    He was informed and shown the warrants, yes.  As far as physically handing them to him in the house, no; but the warrants were in my possession.  He was aware of them.  And there was some conversation about this specific case, and there was no discussion, because I had no knowledge of it and I wasn't about to get involved in it.  He made some remark about what happened as far as the issuing of the warrants, and I told him I didn't know anything about it; there was nothing I could answer for him.

(9/17/86 Tr. 70) Significantly, there was no trial evidence of any conversation regarding the murder

case prior to the reading of *Miranda* rights at the Security Building.  *See Patane*, 124 S. Ct. at 2629.

As there is no evidence that the Montgomery offered inculpatory statements on the way to the Safety

Building or that any remarks he made during the ride were introduced in evidence or used to unearth

incriminating evidence, the court dismisses this claim for relief.

> 26.[37]   *Petitioner's death sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the state was allowed to present evidence of a prior juvenile conviction and the sentencers considered the conviction as an aggravating circumstance.*

During mitigation, Montgomery, not the prosecutor, raised through the testimony of defense

psychiatric witness Dr. Briskin, the issue of Montgomery's being found delinquent for juvenile

involuntary homicide of his uncle in an attempt to explain Montgomery's violent upbringing.  (Tr.

2193) Case law permits comments that are made in response "to the argument and strategy of defense

---

[37]    This claim is properly preserved for habeas review; the Respondent does not argue otherwise.

70

counsel." *Butler v. Rose,* 686 F.2d 1163, 1172 (6th Cir. 1982); *see also Lockett v. Ohio*, 438 U.S. 586 (1978) (holding that the prosecutor's closing remarks that the evidence was "unrefuted" and "uncontradicted" added nothing to the impression that had already been created by the defendant's refusal to testify after the jury had been promised a defense by her counsel and told that the defendant would take the stand). In short, the court finds no constitutional violation. *Byrd*, 209 F.3d at 535.  This is what happened in this case.  In mitigation, Montgomery's expert brought up Montgomery's admitted juvenile slaying of his uncle.  This opened the door for prosecutorial mention of Montgomery's juvenile record in final argument.  *Id.*  This claim is denied.

> 15.[38]  *Misconduct by the prosecuting attorney in withholding evidence favorable to the petitioner on the issue of guilt deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

### A. Applicable Law

In *Brady v. Maryland*, the Supreme Court ruled that a defendant's due process rights are violated if the government suppresses favorable evidence that is material to guilt or punishment, irrespective of the prosecution's good or bad faith.  373 U.S. 83, 87 (1963); *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003).  The prosecution is responsible for gauging the net effect of evidence and disclosing it when the point of "reasonable probability" of a different outcome is reached.  *United States v. Ross*, 245 F.3d 577, 584 (6th Cir. 2001).  A *Brady* violation requires showing more than simply that the prosecution was aware of an item of favorable evidence unknown to the defense.  *Id.*  If the prosecution fails to disclose *Brady*

---

[38]  This claim was properly preserved for habeas review.  Respondent does not argue otherwise.

evidence, the defendant has a constitutional remedy only if he can show a reasonable probability that the result of the trial would have been different.  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995*); Crayton*, 357 F.3d at 569; *Campbell v. Coyle*, 260 F.3d 531, 559 (6th Cir. 2001).

To succeed on a *Brady* claim, the petitioner bears the burden to show that "[1] the prosecutor suppressed evidence; [2] that such evidence was favorable to the defense; and [3] that the suppressed evidence was material."  *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (citing *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).  *See Strickler*, 527 U.S. at 281-82; *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003).

A petitioner can meet the first prong, suppression, by showing that the state either "wilfully or inadvertently" kept evidence from the defense.  *Strickler*, 527 U.S. at 281-82.  The Sixth Circuit held that "[s]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more."  *United States v. Ross*, 245 F.3d 577, 584 (6th Cir. 2001) (quoting *Kyles*, 514 U.S. at 437).  Evidence meets the suppression prong where the prosecution: (1) introduces testimony that it knows, or should know, is perjury; (2) does not honor a defense request for specific exculpatory evidence; or (3) fails to volunteer exculpatory evidence not requested by the defense, or requested only generally.  *Kyles*, 514 U.S. at 433; *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997).

No *Brady* violation occurs "where a defendant knew or should have known the essential facts permitting him to take advantage of the information, or where the evidence is available . . . from another source because in such cases there is really nothing for the government to disclose."  *United States v. Lee*, 2006 U.S. App. LEXIS 18626, *6 (6th Cir. July 25, 2006) (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)).  A defendant is not required, however, to "scavenge for hints of

undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  Both exculpatory and impeaching evidence may satisfy the second prong.  *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999).

To determine the third prong, materiality, the evidence must be considered collectively, not individually.  *Castleberry*, 349 F.3d at 291.  Considered collectively, the *Brady* material must be such that the state court's conclusion on materiality is an unreasonable application of Supreme Court precedent.  *Id.*

The Supreme Court in setting out a procedure for analyzing *Brady* claims, stated: "We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion . . . ." *Kyles*, 514 U.S. at 437.  Accordingly, the court now analyzes whether each of Montgomery's individual grounds for relief satisfy the suppression and exculpatory prongs of *Brady*.  The court's inquiry ends if an item fails one or both of these elements.  The court then examines cumulatively all items that satisfy the first two prongs to determine whether, taken as a whole, they meet *Brady*'s materiality requirement.

**B. Sub-claims Presented in the Petition**

**1. Exculpatory and Suppression Prongs**

Montgomery argues that the prosecution withheld the following information:

a.      *Heard's Nike "hi-top" shoes were blood stained.*

73

Subsequent testing proved that the stains on the shoes were not blood.  (Ex. 37, Ex. TT, p.1181.)  Consequently, the stains could not be considered exculpatory because they do not link Heard to the murders.  Accordingly, the prosecutor's failure to turn over the shoes to Montgomery before or during the trial did not violate *Brady*.  Thus, this sub-claim is meritless.

> b.  *David Ingram and "several"[39] friends saw Ogle alive in a car with a white man at 1:20 a.m. on March 12, 1986, four days after police posited that she was killed.  (37 A. Ex. TT p. 1079.)*

David Ingram reported to police that he saw Ogle alive in the early morning hours of March 12, 1986, four days after when the State theorized she was murdered.  (TT 1078-79.)  This evidence was suppressed because the State did not turn over the report until well after the trial, and then only as a result of a Freedom of Information Act request.  In addition, the report was favorable to the defense because it could have impeached Heard's testimony or contradicted the State's theory of the timing of the murders.  Thus, Petitioner has satisfied the first two prongs of a *Brady* claim.  The court will discuss the third prong in its materiality analysis below.

> c.  *Stains on the seat of Tincher's car were not blood stains.*[40]

In this claim, Montgomery argues only that:

> The State wrongfully withheld information in its possession that stains found in the seat of Tincher's car were not blood stains.  This contradicts the representations

---

[39]  Montgomery misquotes the police report as stating that Ingram reported that he and *seven* friends observed Ogle.  As both the prosecution and the state courts have noted, the correct phrasing is *several* friends, not seven.  (*See* TT 1079.)

[40]  Respondent argues that this claim is procedurally defaulted.  (Resp't Amend. Return of Writ 88.)  The court declines to decide that issue and, in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

advanced by the State at trial that the stains found in Tincher's car <u>were</u> blood stains.

(Pet. For. Writ of Habeas Corpus 27, ECF No. 13) (emphasis added).  In his action in the Court of Appeals, Montgomery argued, probably mistakenly, that the stains *were* blood.  That court held:

> In his fifty-first claim for relief, appellant argued that the state wrongfully withheld exculpatory evidence that the stains found in the seat of Tincher's car were blood stains.  Appellant then argues that this evidence "contradicts the representations advanced by the State at trial that the stains found in Tincher's car were blood stains."  This argument is clearly nonsensical and probably a misprint.  Nevertheless, photographs submitted into evidence at the trial showed the inside of Tincher's car with a number of obvious blood stains.  Accordingly, appellant was apprised of this fact at trial, could have raised issues regarding it on appeal and is therefor precluded from raising them here.  The court did not err in dismissing the fifty-first claim for relief."

*Montgomery*, 1999 WL 55852, at *8.

Forensic reports reveal that the stains found in Tincher's car (left, right, and center rear floor) were indeed human blood stains. (Ex. 37, Ex. TT p. 1182.)  Hence, the evidence was not exculpatory.  Nor could this evidence be deemed suppressed as the fact of the blood stains was revealed at trial.  *See United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) (no *Brady* violation where evidence was provided to the defendant in time for cross-examination).  Thus, this sub-claim is meritless.

> d.      *Stains found on Montgomery's jacket were saliva.*

First, the court notes, as did the Court of Appeals, that the evidence merely shows that an employee at the dry cleaners believed that the stains resembled saliva; no evidence proves what the stains actually were.  (*See* Ex. 37, TT, p. 1146.)  Moreover, as this evidence was disclosed to Montgomery during trial, (Tr. 1580-1581), the evidence does not satisfy the suppression prong.  *Crayton*, 357 F.3d at 569.  Thus, this sub-claim is meritless.

     e.     *A hit man for a drug cartel (Ogle and Tincher had been using and selling drugs in the several weeks before their deaths);*

     h.     *An unnamed neighbor's report that unnamed men were arguing in the victims' apartment the night before the murders;*

     i.     *Tincher was afraid of her step-father, a Toledo police officer, who had tried to molest her in the past and was stalking her at the time of the murders; and*

     k.     *Ogle's boyfriend was jealous of her ex-boyfriend, and both men were suspects.*

Several of the police reports rumored that Ogle and Tincher might have been killed by someone other than Montgomery.  The police did not release this information until after trial, and then, only under a judge's Freedom of Information Act order.  The evidence on which Montgomery relies are anonymous phone calls to the police regarding the possibility of a hit man who "picked up Montgomery" (TT 1133); vague secondhand information about the victim's character, (TT 1141); anonymous calls describing unidentified people arguing in the victims' apartment the morning of their murders (TT 1127); secondhand reports that Tincher had said that her stepfather had tried to molest her in the past and that he was stalking her at the time of the murders (TT 1113, 1127); the police report indicating that Tincher's diary was turned over to her step-father (TT 1189, 1191); reports that Ogle's current boyfriend had "heard in the street" that Ogle's ex-boyfriend wanted to get back together with her (TT 1119); and conflicting accounts by Ogle's current boyfriend about the events on the night before the murders (TT 1157-1160).

The court notes that some of the withheld information that Montgomery points to does not fit with the State's theory of the case and instead introduces motives for people other than the Petitioner to have committed the murders.  All of these reports, however, are comprised of inadmissible hearsay.

The United States Supreme Court has held that there is no *Brady* violation where the prosecution withheld evidence that would have been inadmissible during trial.  In *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995), the Supreme Court found that the prosecution's failure to reveal the results of polygraph tests did not constitute a *Brady* violation because such evidence was not admissible under state law.  The *Wood* Court opined that because the polygraph tests were inadmissible, they did not constitute "evidence."  Thus, it concluded, the failure of the prosecutor to disclose the results of these tests had no direct impact on the trial's outcome.  *Id.*  Moreover, "the prosecution is not required to disclose information concerning the investigation, existence, or identity of any other unnamed, uncharged suspects . . . ."  *Williams v. Coyle*, No. 96CV793, slip op., at 67-68 (N.D. Ohio Apr. 2, 1998).  "While the prosecution must disclose concrete, specific evidence that tends to inculpate another, there is no obligation to release more 'ephemeral' information on  the possibility of other suspects."  *Id.* at 68 (citing *Jarrell v. Balkcom*, 735 F.3d 1242, 1258 (11th Cir. 1984)).  Accordingly, the prosecutor was not required to disclose this evidence.  Therefore, these sub-claims are meritless.

>    f.    *Several other witnesses saw the car where Tincher's body was found.*

Three witnesses testified that they saw Tincher's car at the corner of Angola and Wenz Roads, where it was later found by the police.  Four additional witnesses who were not called to testify reported that they also saw Tincher's car at the corner of Angola and Wenz, and saw a "black male" near the car.[41]  Montgomery argues that the prosecutors' failure to turn over the additional "sightings" of Tincher's car violated *Brady*.  This court disagrees.  Calling four additional witnesses

---

[41]    One of the four uncalled witnesses did not see any person in the area besides the police.

to testify to similar facts would merely have been cumulative. Where the withheld evidence supports the evidence in the record, there is no *Brady* violation. *See Gillard v. Mitchell*, 443 F.3d 517, 533 (6th Cir. 2006) (holding no *Brady* violation when "two reports apparently not handed over to trial counsel were merely cumulative to the information in the other reports and thus not material for purposes of [a] *Brady* analysis.") (citations omitted). Moreover, as three of the uncalled witnesses stated that they saw a person near Tincher's car who fits Montgomery's description, this evidence was not exculpatory. Thus, this sub-claim is meritless.

> g. *Tom Hager saw a second car parked near Tincher's car at 7:30 a.m. on March 8, 1986.*

As the Court of Appeals and Respondent have noted, Montgomery's interpretation of the record's sole reference to Hager does not indicate any observation of a second car. (*See* Resp't Amend. Return of Writ 91); *Montgomery*, 1999 WL 55852, at *11. Thus, while a second car near Tincher's car may have proven exculpatory if suppressed, there is no support in the record for this claim. The court must therefore dismiss it as unsupported by the record.

> j. *Witnesses observed that Ogle and Tincher were "nervous and upset" before the murders.*[42]

Montgomery does not identify what part of the record supports this claim. Nor does Montgomery's claim provide any evidence to explain why the girls allegedly appeared nervous. Montgomery's suggestion that the girls were nervous and upset because they were in fear of being

---

[42]     Respondent argues that this claim is procedurally defaulted. (Resp't Amend. Return of Write 88.) The court declines to decide that issue and, in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred. It did not.

murdered by someone other than Montgomery is sheer speculation.  As the Petitioner has failed to prove the existence of exculpatory evidence, this sub-claim is meritless.

> l.    *Police reports were authored by Det. Marx rather than Det. Przeslawski.*

As the Court of Common Pleas held (Rep't Amend. Reply to Writ, Ex. 45, p.12), the transcript of the proceedings indicates that Det. Przeslawski testified as to the police records he made, and these police reports were made available to the court and the defense. (Tr. 1714-15, 1717-18.)  Consequently, Montgomery should have been aware of who authored specific police reports. Because the police reports were not suppressed from the defense, this sub-claim is meritless.

> m.    *State suppressed evidence there was no telephone conversation between Heard and inmate Michael Clark, during which Heard confessed.*

In their investigation, the police were first alerted to Heard's involvement when a prison inmate, Clark, reported to Crime Stoppers that he had received a March 8, 1986, telephone call from Heard saying that he had seen two white girls murdered.  Montgomery makes much of the fact that Heard was not in prison when he supposedly called Clark and that "Toledo Detective Sifuentes, who interviewed Clark, reported that Clark was making up this story as the prisoners' phone in the Lucas County Jail was not turned on at the time he claimed to have received the phone call from Heard." (Def.'s Pet. 29.)  Montgomery does not identify evidence supporting the claim that the telephone was not turned on at the time of the alleged phone call.

After reviewing the exhibits, the transcript of the proceedings, and the Court of Appeals' opinion, the court finds this sub-claim meritless.  Although no witness directly corroborated Heard's morning phone call, Heard did not need to be in or at the jail to speak to Clark by telephone.  (Tr.

1662-1664) (indicating that the detectives located Heard outside his home the day after receiving Clark's Crime Stoppers phone call).  There is also no evidence as to whether or not the prison telephone was turned on at that time.  The police report says that the phone log does not indicate what time the inmates' phone was turned on that morning, but also says that the phone was usually turned on at 9:00 a.m. on Saturdays and Sundays.  (Def.'s Post Conviction Petition Ex. p. 1156.) Also, several witnesses – both prison staff and inmates – stated that Clark confirmed the call and its substance on the morning of March 8, 1986.  (*Id.* at 1151, 1156.)  As Petitioner has failed to prove the existence of exculpatory evidence, this claim is meritless.

### 2. Materiality Prong

Because the court has found that Montgomery has satisfied the first two *Brady* prongs of sub-claim (b), the court now must determine whether the State's failure to disclose the existence of this police report was material and would therefore warrant habeas relief under *Brady*.[43]  For the following reasons, the court concludes that it was material and thus undermines the court's confidence in the outcome of Montgomery's trial.

---

[43]     The court also finds that Montgomery is not procedurally barred from bringing this claim in federal court because he diligently sought to present Ingram's evidence in the state court.  The AEDPA, 28 U.S.C. § 2254(e)(2), requires that habeas petitioners "develop the factual claim in state court proceedings" before raising issues based on those facts in federal habeas corpus.  *Williams v. Taylor*, 529 U.S. 420, 430 (2000).  When Montgomery was provided with Ingram's statement in 1992, he was engaged in *Murnahan* proceedings, which narrowly allow presentation of claims of ineffective assistance of appellate counsel.  *See Coleman v. Mitchell*, 268 F.3d 417, 429-30 (6th Cir. 2001).  Once Montgomery completed his *Murnahan* proceedings, he promptly filed an application for post-conviction proceedings, which included his claim that the Ingram statement was withheld in violation of *Brady*.  He therefore fulfilled the due diligence requirement of § 2254(e)(2).

The Supreme Court has articulated when undisclosed evidence is material and therefore violates the *Brady* rule: "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . but whether in its absence [the defendant] received a 'fair trial,' understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.  As the Supreme Court made clear in *Strickler*, to obtain relief, the petitioner must do more than show that the new evidence *might* have changed the outcome of the trial; nor is the standard met if there is a reasonable *possibility* of a different outcome.  The petitioner must convince the court that there is a reasonable *probability* that the result of trial would have been different.  *Strickler*, 27 U.S. at 289-91.

Further, when determining whether the withheld material created a reasonable probability of a different outcome, courts should not simply look to see if there is sufficient and independent evidence in the record to support the conviction.  *Id.*  Rather, courts should determine whether, even with the inclusion of the *Brady* materials, a conviction would stand with confidence.  *See id.* at 294 ("The record provides strong support for the conclusion that petitioner would have been convicted . . . even if [the key prosecution witness] had been severely impeached."); *Kyles*, 514 U.S. at 451 (reversing conviction where "the physical evidence remaining unscathed [by the disclosure of *Brady* evidence] would, by the State's own admission, hardly have amounted to overwhelming proof that [the petitioner] was the murderer")..  Thus, for this sub-claim, the court must determine whether the verdict is still worthy of confidence when Ingram's report is taken into account.

In his petition, Montgomery claims that Ingram's report is material because the information in the report: (1) contradicts the State's theory of the case that Ogle was murdered before Tincher

81

on the morning of March 8, 1986; (2) contradicts Heard's testimony; and (3) disproves the capital

specifications.  (ECF No. 13.)  The Ohio Court of Appeals rejected this claim and ruled as follows:

> In his fiftieth claim for relief, appellant asserted that the state wrongfully withheld exculpatory evidence that on March 12, 1986 at approximately 1:30 a.m., Debra Ogle was seen alive in the parking lot of her apartment complex by seven [sic] witnesses who went to high school with her.  Appellant supports this claim with a police report taken at approximately 2:30 a.m. on March 12, 1986.  At that time, Debra Ogle was still considered missing although her car had been discovered abandoned behind a home several blocks from the home of the co-defendant Glover Heard.  That report reads in relevant part:
>
> > PRO stated that he and several friends were at the Oak Hill apartments on Hill when they saw a Blue Ford Escort with Debbie Ogle driving around the complex.  Later they again saw her as a passenger in same auto.  Debbie Ogle waved to them as they knew her from Rogers High School.  She was with white male with long side burns.  She did not appear distressed.
>
> The lower court concluded that this isolated information, recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial.  We agree and conclude that the trial court did not err in dismissing the fiftieth claim for relief.

*State v. Montgomery*, 1999 WL 55852, at *8 (Ohio App. 6th Cir. 1999); (37 A. Ex. TT p. 110079.)

The court finds the Ohio Court of Appeals' analysis of this claim to be somewhat cursory and that

this sub-claim warrants a detailed analysis.[44]

---

[44]    Section 2254(d)'s constrained standard of review only applies to claims adjudicated on the merits in the state court proceeding.  *Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004).  When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  *Id.*; *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003).  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to or involved an unreasonable application of clearly established federal law, but rather conducts a *de novo* review of the claim.  *Maples*, 340 F.3d at 436-37; *Benge v. Johnson*, 312 F. Supp. 2d 978, 987 (S.D. Ohio 2004).

The court finds that the State's case was not airtight and that it could have been undermined by sufficient contradictory evidence.  Although some evidence points to Montgomery (for example, that he owned the gun that was used in the murders), other evidence points equally to both Montgomery and his co-defendant, Heard (for example, that Montgomery's uncle testified that both defendants passed the refrigerator and that either could have taken the gun, and that no fingerprints were found on the gun).  Substantial portions of the State's theory relied on the testimony of Heard, who had a motivation to lie to exculpate himself due to the circumstantial evidence pointing to both defendants.

Heard admitted on cross-examination that he had given four different versions of the facts to the police.  Heard testified that the four stories were as follows: First, he denied knowing anything about the murders. (TT 1780-81.)  Second, once the detectives confronted Heard about the phone call that Clark had reported, in which Clark said that Heard had bragged about seeing two girls killed, Heard admitted that story. (*Id.* at 1781.)  Third, Heard said that he saw a known dope dealer driving Ogle's brown car down an alleyway.  (*Id.* at 1782.)  Fourth, Heard said that Bruce Ellis, one of the men whom Montgomery and Heard had been drinking with the night before the murders, had dropped Heard off and that Heard had gone to a carwash, where an unknown black male told him that two white girls had been killed.  (*Id.* at 1783.)

---

While the Court of Appeals addressed this claim, it failed to explain why the fact that the investigation was "ongoing" and "still being pieced together" was sufficient cause for the State's failure to disclose it to the defense.  This cursory may not be construed as an adequate to explain its reasoning.  Moreover, to the extent that the Court of Appeals's analysis of this claim is an "adjudication on the merits," the court finds its application of *Brady* to be unreasonable because it failed to provide more than a conclusory statement regarding the materiality of the withheld report.

83

On the stand, Heard proceeded to give a fifth version of the facts, a version that was consistent with the State's theory of the case.  Heard admitted being at the scene of Ogle's murder, and stated that he had seen Montgomery and Ogle get out of Ogle's car and walk about 40 yards into a field.  Heard stated that he saw Ogle sitting in a squatting position, and that when he looked away he heard two gunshots.   When he looked back, Ogle was lying on the ground.  (*Id.* at 1770-73.) However, Officer Marx testified that he told Heard that the distance from the street to the place where the body was found was actually more than 80 yards and that it was "physically impossible" for Heard to have seen what he says he saw.  (*Id.* at 1864-1868.)  Marx said that he told Heard this information in the hope that it "would be an enticement for him to give us more information."  (*Id.* at 1866.)

The court finds that sufficient weaknesses exist in Heard's testimony, and therefore in the State's case, that could have been undermined by the withheld police report.  For example, the State posited that Montgomery first killed Ogle for her car, and then killed Tincher afterward to eliminate the witness who had last seen Ogle alive.  Heard testified that he saw Ogle lying dead on the ground on the morning of March 8, 1986.  Yet the withheld police report indicates that David Ingram reported that he and several witnesses saw Ogle alive and that she waved to them in the early morning hours of March 12, 1986.  The fact that the alleged first victim was seen alive four days after the alleged second victim was found dead directly contradicts Heard's testimony, the State's timeline of the murders, and the State's theory of Montgomery's motivation for killing Tincher. Furthermore, if the defense had received this report, it could have led to testimony by multiple people who could have corroborated Ingram's account.  According to Ingram, he and the other witnesses were high school friends of Ogle, and therefore were in good positions to identify Ogle.

84

Consequently, if a jury found this testimony credible, it would have severely undermined the State's theory of the case.

In addition, the State posited that robbery was the motivation for Ogle's murder, yet Ogle's car and wallet – the fruits of the robbery – were found in Heard's possession, not Montgomery's. In fact, Heard admits that he took these items, and says that he was planning to take Ogle's car even if Montgomery had not told him to do so (according to Heard's version of the facts).

This case is similar to *Jamison v. Collins*, 291 F.3d 380 (6th Cir. 2002), in which the Sixth Circuit held that a habeas petitioner was entitled to relief because of the State's *Brady* violations. In that case, the prosecutor unwittingly failed to provide the defense with several exculpatory documents.  The district court found that these documents would have significantly undercut the credibility of the testifying co-defendant, the principal witness at the petitioner's trial.  Moreover, the court held, supplying the documents to the defense could have provided it with an alternative theory of how the robbery-murders were committed.  On appeal, the Sixth Circuit affirmed the district court's decision.  It found that the suppressed evidence was material because the co-defendant "testifying as [the petitioner's] alleged accomplice in the robbery, was the central witness of the trial." *Id.* at 389.  Additionally, the court found, withheld documents containing a physical description of the robbers, taken together with the evidence impeaching the co-defendant's testimony, could have "undermine[d] the prosecution's theory of how [the victim] died, and indicate[d] other suspects for the . . . murder." *Id.* at 389-90.  The Sixth Circuit concluded that the prosecution's failure to provide these documents to the defense was material to the outcome of the petitioner's trial, entitling the petitioner to habeas relief based under *Brady*.

85

Like *Jamison*, the court finds here that the withheld police report could have undermined Heard's testimony, which was the core of the State's case.  Also similar to *Jamison*, the police report could have undercut the State's theory of how the murders occurred by completely discrediting the State's timeline of the murders as well as its supplied motive for Montgomery's murder of Tincher. While the State adduced other evidence that could have led to Montgomery's conviction, that is not the standard.  As stated above, the *Kyles* holding dictates not that this court assess whether sufficient evidence existed to convict in the absence of the withheld evidence, but that it discern "whether in its absence [the defendant] received a 'fair trial,' understood as a trial resulting in a verdict worthy of confidence." 514 U.S. at 434.  Had the defense been in possession of this report, it might have provided the jury with an entirely different account of the timing and motive of the murders. Although there is no certainty that the jury would have found the State's theory to be credible even if the defense had impeached Heard's testimony, the court's confidence in the jury's verdict is undermined.  In the instant context,  much of the State's case was made through co-defendant Heard, who gave police four different versions of his knowledge of the murders, and then testified to a fifth version at trial.  While the State's theory was that Montgomery committed the murder to rob Ogle, Heard admittedly wound up with Ogle's car and wallet and testified that he was planning to take Ogle's car even in the absence of Montgomery's instruction to do so.  Under the circumstances, where the State's theory was that Tincher was killed to cover up Ogle's murder, the court finds that the withheld police report revealing information suggesting that Ogle was seen alive four days after she was allegedly murdered would have severely undercut Heard's credibility and destroyed the State's timeline of the case.  As such, the court finds that the prosecution's suppression of the police report created a reasonable probability that the result of trial would have been different.  Therefore,

the court finds that the State's failure to provide the defense with this report was material to the outcome of Montgomery's trial. Accordingly, this sub-claim is well-taken.

> 16.[45]    *Misconduct by the prosecuting attorney in the guilt stage of the trial proceedings deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

In this claim, Montgomery argues that state misconduct during his trial deprived him of his right to constitutional due process.[46]   These claims include:

> (a, b)   *Prosecution attempted to illicit hearsay evidence*

---

[45]     This claim was properly preserved for habeas review. The Respondent does not argue otherwise.

[46]     Four claims regarding the prosecution's improper arguments were non-prejudicial because corrected by a later instruction by the trial judge. *Williams v. Groose*, 77 F.3d 259, 262 (8th Cir. 1996). These claims include:

(d)     That the prosecutor told the jury that felony-murder regards as irrelevant when the underlying felony took place in relation to the killing. (Tr. 1966-1967.) The trial judge corrected any error in the prosecutor's argument by instructing the jury correctly on the issue of felony murder as follows: "'While committing or attempting to commit' means that the death must occur as part of the acts leading up to or occurring during or immediately subsequent to the aggravated robbery, and the death was directly associated with the aggravated robbery." (Tr. 2062-2063.) *See, e.g., Chapman v. California*, 386 U.S. 18 (1967).

(e)     Likewise, any argument of speculative facts by the prosecution was corrected by the trial judge's later charge that the jury was to ignore arguments of counsel in reaching their verdict. (Tr. 2056-2057.)

(f)     The issue of admission of "gruesome" photographs has been dealt with by the Court on its merits and was found non-prejudicial; thus, the prosecutor's comments regarding those photos does not rise to a constitutional deprivation. *Gonzalez v. DeTella*, 127 F.3d 619, 620-21 (7th Cir. 1997).

(g)     Similarly, the prosecutors improper argument that "victims are given no rights" was corrected by the court's later instruction to ignore arguments of counsel in reaching their verdict. (Tr. 2056-2057.)

There was no error in the prosecution's attempt to illicit inadmissible hearsay testimony from witnesses where that testimony was successfully kept out of evidence.  (*See, e.g.*, Tr. 1213-1219.) *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (Court presumes jurors follow judicial instructions.)

> *(c, h)  Prosecutor improperly exceeded the grounds of cross-examination and closing arguments on rebuttal.*

Any error in the prosecutor's cross-examination or closing argument was corrected by the trial court when it cautioned jurors not to consider the prosecutor's arguments as evidence (Tr. 2056-2057.)  *See United States v. Young*, 470 U.S. 1, 23 (1985)

Montgomery's claims of prosecutorial misconduct are therefore denied.

> *32.[47]  Misconduct by the prosecuting attorney in the mitigation stage of the trial proceedings deprived Petitioner of his rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

The acts and arguments by the prosecutor during the mitigation stage of trial were corrected by the judge's instruction that counsel's argument was not to be considered as evidence.  (Tr. 2056-2057). *United States v. Young*, 470 U.S. 1, 23 (1985).  The court assumes that the jury follows the judge's instructions.  *See, e.g.*, *Francis v. Franklin*, 471 U.S. 307, 340 (1985).

These claims include:

> (a)    *Prosecutor's denigration of Montgomery's evidence as "excuses" or "justification"*
>
> (b)    *Prosecutor's arguments based on inferences unsupported by the trial evidence*
>
> (e)    *Prosecutor argued that "youth" and "family history" were non-statutory aggravating factors*
>
> (f)    *Prosecutor argued Montgomery would be released at age 40 if no death penalty were imposed*

---

[47]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

(g)     Prosecutor argued non-statutory aggravating factors, including future dangerousness, lack of remorse,  prior unintentional killing of Montgomery's uncle, and that the victims  were shot at close range

(h)     Prosecutor argued that the murder of Tincher was committed to escape detection of Ogle's murder

Montgomery's remaining claims have been dealt with on the merits and found non-prejudicial (see discussion on claims 17 and 33).  These claims include:

(c)     Gruesome photos

(d)     Prosecution listed all mitigating factors, including those not raised or argued by Montgomery

Under these circumstances, the court denies the claim.

## C. Racial Bias by the State

In claims 11, 12, 13, and 18, Montgomery argues that various acts by the state denied him of a racially impartial trial. None of his claims have merit.

11.[48]     Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the state was not required to provide a race-neutral explanation for its use of peremptory challenges.

In this claim, Montgomery argues that the prosecution violated his right to a jury of his peers by failing to articulate a race-neutral explanation for peremptorily challenging an African-American from his jury.

The exercise of racially discriminatory peremptory challenges by the state offends the Equal Protection Clause. *Batson v. Kentucky*, 476 U.S. 79, 88-89 (1986).  The Supreme Court enumerated a three-step analysis to determine whether a *Batson* violation had occurred.  *Purkett v. Elem,* 514

---

[48]     This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

U.S. 765, 767-68 (1995).  The party disputing the propriety of a peremptory challenge must first demonstrate a prima facie case of discrimination. *Georgia v. McCollum*, 505 U.S. 42, 59 (1992). A prima facie case is established by showing: 1) the defendant is a member of a cognizable group; 2) the opposing side has exercised peremptory challenges against members of the defendant's race or gender; and 3) the relevant circumstances raise an inference of purposeful discrimination. *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999). The presence of one or more members of the defendant's race or gender on the jury does not necessarily preclude a *Batson* claim.  *Id.* at 587.  Nor does the moving party need to establish a systematic pattern of discrimination in the exercise of the peremptory challenges.  *United States v. Mahan*, 190 F.3d 416, 424 (6th Cir. 1999).

After the party raising the *Batson* claim establishes a prima facie case, the party making the peremptory challenges must present a race neutral explanation for having excluded the jurors. *Georgia*, 505 U.S. at 59; *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003); *Lancaster v. Adams*, 324 F.3d 423, 432 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 682 (6th Cir. 2001). Unless a discriminatory intent is inherent in the explanation, the reason offered should be deemed neutral if facially based on something other than the race or gender of the juror.  *Hernandez v. New York*, 500 U.S. 352, 359-60 (1991); *Kelly v. Withrow*, 25 F.3d 363, 367 (6th Cir. 1994).

Although arguably, Montgomery raised a partial *Batson* claim by contending that the prosecutor used a peremptory challenge to exclude a single African American (among four peremptory challenges exercised), he made the claim only in passing and failed entirely to show that the relevant circumstances raised an inference of purposeful discrimination.  Montgomery therefore

failed to make out a prima facie case of discrimination. Under these circumstances, the prosecutor

was not required to state a neutral reason for excluding Terry Ramsey.[49] This claim is denied.

> 12.[50]   *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth,*
> *and Fourteenth Amendments to the United States Constitution as the state*
> *systematically eliminated African-Americans from the jury pool.*

In this claim, Montgomery argues that his constitutional rights were violated because the state

systematically excluded African Americans from the jury pool.  There is no error.

To show verdict-impacting racial bias in a jury venire, Petitioner must do more than merely

show a racial imbalance between the jury venire and the population at large.  Indeed, he must show:

> 1. The group alleged to be excluded is a "distinctive" group in the
> community;
>
> 2. The representation of this group of venires from which juries are
> selected is not fair and reasonable in relation to the number of such
> persons in the community; and
>
> 3. This under-representation is due to systematic exclusion of the group
> in the jury selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).  In support of his claim, Petitioner submitted data

detailing the grand jury members (but not their races) from his trial and an untitled page of statistics

seemingly indicating that more African Americans are defendants in Lucas County criminal actions

than whites, none of which demonstrate that African Americans are systematically excluded from

---

[49]     Three other African Americans were correctly dismissed for cause:
                McCall – verified conflict with employment (Tr. 337, 1034);
                Jones – Montgomery's friend (Tr. 876, 898, 900); and
                Colby – disappeared from the courtroom and could not be found following
                        a search (Tr. 1121-1124).
        Wilcox was seated as an alternate juror.

[50]     This claim is properly preserved for habeas review; the Respondent does not
        argue otherwise.

91

Ohio criminal jury pools.  Montgomery has also shown that only one African American was ultimately seated in his case.

Since *United States v. Tuttle*, 729 F.2d 1325, 1327 (11th Cir. 1984) was decided, this Circuit has consistently required an absolute disparity of over 10% between the underrepresented group's proportion of the general or age-eligible population and its representation on the venire to establish a prima facie case of racial disparity in jury pools.  *See e.g., Coleman v. Mitchell*, 268 F.3d 417, 441-42 (6th Cir. 2001); *Butler v. United States,* 611 F.2d 1066, 1069-70, n. 9 (5th Cir.1980), *cert. denied sub nom. Fazio v. United States,* 449 U.S. 830 (1980).

In this case, Montgomery has neither shown constitutionally significant under-representation of African Americans on his jury or that any alleged under-representation is due to systemic exclusion of the group in the jury selection process.  To the contrary, selection of jurors from voting lists (as was done in this case) has consistently been upheld as a constitutional means for selecting juries.  *See, e.g., Duren v. Missouri*, 439 U.S. 357, 366-67 (1979).  This claim is therefore dismissed.

*13.*[51]    *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the capital charging system of Lucas County is infected with systematic racism.*

In this claim, Montgomery argues that the prosecutorial system in Lucas County is unconstitutionally racist.  In support of his argument, he cites only Post Conviction Exhibit TT, which includes nothing demonstrating "that the capital charging system of Lucas County is infected with systematic racism." The court finds there is no error.

---

[51]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

92

In other cases where similar claims have been raised, the defendant has argued, based on statistical analyses and reports, that African Americans are disproportionately charged and convicted of death penalty crimes.  For instance, in *McCleskey v. Kemp*, 481 U.S. 279 (1987), the Supreme Court rejected Eighth and Fourteenth Amendment challenges to the Georgia capital punishment statute and its administration based upon a study indicating that, in Georgia, persons who murder whites receive the death penalty more often than persons who murder blacks, and that black murderers of whites receive the death penalty more often than white murderers of whites. There the Court held that to prevail under the Equal Protection Clause of the Fourteenth Amendment, a defendant must prove that the decision-makers in *his or her case* acted with discriminatory purpose and concluded that the general study cited was insufficient to support an inference of discrimination in McCleskey's case.  *Id*. at 297.  Likewise, in *Smith v. Mitchell*, this Circuit held "[r]equiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts."  348 F.3d 177, 211 (6th Cir. 2003) (quoting *McCleskey*, 481 U.S. at 296, nn. 17 and 18); *see also Coleman v. Mitchell*, 268 F.3d 417, 441-42 (6th Cir. 2001) (statistics demonstrating a "striking racial discrepancy between African American representation in the Ohio population generally (9%) and such representation on Ohio's death row (49%)" are "extremely troubling" but insufficient to demonstrate a constitutionally significant risk of racial bias in the prosecution of criminals under *McCleskey*). The petitioner has the burden of establishing a prima facie case of unconstitutional conduct by the prosecutor in his case. *Smith*, 348 F.3d at 212.

Moreover, we do not assume that a prosecutor improperly discharged their official duties. Indeed, absent "clear evidence to the contrary, courts presume that they [prosecutors] have properly

93

discharged their official constitutional duties." *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14-15 (1926). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978).

Of course, a prosecutor's discretion is "subject to constitutional constraints," including racial discrimination under the Due Process Clause of the Fifth Amendment. *United States v. Batchelder,* 442 U.S. 114, 125 (1979); *Bolling v. Sharpe,* 347 U.S. 497, 500 (1954); *Oyler v. Boles,* 368 U.S. 448, 456 (1962). Thus, a defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive" that the system of prosecution amounts to "a practical denial" of equal protection of the law. *Yick Wo v. Hopkins,* 118 U.S. 356, 373 (1886).

Montgomery must demonstrate that the state prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.*; *accord Oyler,* 368 U.S. at 456. To establish a discriminatory effect in a race case, a claimant must show that similarly situated individuals of a different race were not prosecuted. *Ah Sin v. Wittman*, 198 U.S. 500 (1905). Ah Sin, a Chinese national, petitioned a California state court for a writ of habeas corpus, seeking release from prison under a San Francisco County ordinance prohibiting persons from setting up gambling tables in rooms barricaded to stop police from entering. *Id* at 503. He alleged "that the ordinance is enforced 'solely and exclusively against persons of the Chinese race and not otherwise.'" *Id.* at 507. The Court rejected his claim because it did not allege "that the conditions and practices to which the

94

ordinance was directed did not exist exclusively among the Chinese, or that there were other offenders against the ordinance than the Chinese as to whom it was not enforced." *Id.* at 507-08.

In this case, as Montgomery has not demonstrated that the Lucas County capital charging system is racially biased or that his prosecution was racially biased, the court dismisses his claim.

> 18.[52] *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that evidence that was presented against him was manufactured for the advancement of an investigating officer's racist agenda.*

In a final effort to demonstrate that prosecution of his case was racially motivated, Montgomery alleges that Detective Keefe Snyder lied about inculpatory statements that Montgomery allegedly made in a pre-trial polygraph to further Snyder's alleged racism. In support of this claim, Petitioner offers only his own affidavit, saying, in particular part:

> On March 12, 1986, I was given a polygraph test by Toledo Police Detective Keefe Snyder. Following the interrogation on March 12, 1986, Detective Snyder used racial epithets against me, and stated that he would see me "go down for messing with white girls." A physical altercation ensued between Detective Snyder and myself following this statement. Detective Arthur Marx broke up the fight.

(App. to Pet. to Vacate or Set Aside Judgment, Vol. IV, Ex. BB at 915.) On post-conviction review, the Ohio appellate court denied relief, finding:

> In his sixty-second claim for relief, appellant asserted that the state wrongfully withheld exculpatory evidence that evidence had been manufactured against appellant by Detective Keefe Snyder in order to advance his racist agenda. In support of this claim, appellant submitted his own affidavit in which he states that on March 12, 1986, he was given a

---

[52]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion. Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred. It did not.

> polygraph examination by Detective Snyder, that Snyder used racial epithets against him and that Snyder stated he would see appellant "go down for messing with white girls." Assuming the truth of this affidavit, appellant has still failed to produce any evidence that the Snyder [sic] manufactured evidence against him. Moreover, in that appellant himself was well aware of Snyder's statements prior to trial, he could have raised the issue in the original trial court proceedings. Accordingly, the trial court did not err in dismissing the sixty-second claim for relief.

*Montgomery*, 1999 WL 55852 *13.  The court agrees with that analysis.  Montgomery's affidavit is self-serving.  *See, e.g., Cuppett v. Duckworth*, 8 F.3d 1132, 1139  (7th Cir. 1993).

As well, even assuming that the allegations in Montgomery's affidavit are true, Montgomery's claim demonstrates no prejudice to his conviction and sentence, as Montgomery fails to demonstrate that Snyder offered manufactured evidence at trial.  The polygraph was neither admitted or discussed at Montgomery's trial.  Montgomery's claim is thus dismissed.

## D. Evidence

In claims 17, 20, 23, 24, 38, 40, 42, and 48, Montgomery argues that various evidentiary errors deprived him of a fair trial.

> 17.[53]  *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the jury was shown inflammatory and gruesome photos of the victim during the guilt phase of his trial.*

In this claim, Montgomery argues that the trial court improperly admitted cumulative, gruesome photographs.  In particular, Montgomery argues that the following eight and a half by eleven photos were improperly admitted into evidence because unduly gruesome and duplicative:

---

[53]  This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

96

A)     A photo of Debra Ogle, a bullet hole visible near the left eye.

B)     A photo of Cindy Tincher as found in her automobile, blood coming out of her mouth and nose and visible on her hair.

C)     A photo of Cindy Tincher, in the car, her head back.

D)     A photo of Cindy Tincher showing her hands folded in her lap.

E)     A photo of the body of Debra Ogle as found in the field.

F)     A photo of the back of Debra Ogle's neck with a wound visible.

G)     A photo of the top of Debra Ogle's head with a bloody visible wound.

To the extent that this is a challenge to the technical correctness of these evidentiary rulings, this court lacks authority to consider the challenge. *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) ("A state court evidentiary ruling will be reviewed by a federal *habeas* court only if it were so fundamentally unfair as to violate the petitioner's due process rights.")

Montgomery argues that the admission into evidence of seven photographs of the Ogle and Tincher's bodies was excessive and fundamentally unfair. He notes that the Supreme Court has stated: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee,* 501 U.S. 808, 825 (1991).

Review of Montgomery's claim suggests that the photos introduced in this case presented a fair representation of Olge and Tincher's corpses at the time they were discovered.  The photographs "were introduced during the coroner's testimony to illustrate [his] testimony," the photos present different perspectives of the victims, and that the photographs "were used to illustrate" the nature of the encounter that immediately preceded Ogle and Tincher's death. *United States v. Brady*, 595 F.2d 359, 361-62 (6th Cir. 1979.)   Under these circumstances, the photographs "probative value substantially outweigh[ed] the danger of unfair prejudice" to Montgomery. *Id.*  The court therefore

97

concludes that admission of the seven photographs of Ogle and Tincher did not deny Montgomery a fundamentally fair trial. *See Willingham v. Mullin,* 296 F.3d 917, 928-29 (10th Cir. 2002) (denying relief on a habeas petitioner's claim that the admission of the 22 photos of the murder victim's body was so unduly prejudicial as to render his trial fundamentally unfair). The court therefore denies Montgomery's claim for relief.

> 23. *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that there is a sufficient amount of residual doubt that exists to cause the sentencer to find that the mitigation outweighs the aggravating circumstances in this case.*

In this claim, Montgomery argues that the Ohio courts erred by failing to consider residual doubt as a mitigating factor. The United States Supreme Court neither requires nor disallows consideration of "residual doubt" as a mitigating factor in a capital crime. *See, e.g., Franklin v. Lynaugh*, 487 U.S. 164, 173 (1988); *Lockhart v. McCree*, 476 U.S. 162, 181 (1986). The issue presented is thus one purely of state law and is not an issue that may be considered on habeas review. *Anderson v. Hacleess*, 459 U.S. 4 (1982). Nevertheless, there was no error.

Montgomery neither asked for or received an instruction that the jury consider residual doubt as a mitigating factor. The jury recommended that the death penalty be imposed. Ohio has since determined that residual doubt could not be used as a mitigating factor. *State v. Bey*, 85 Ohio St. 3d 487, 508-09 (Ohio 1999). The Sixth Circuit has found no infirmity in this approach. *Coleman v. Mitchell*, 268 F.3d 417, 447 (6th Cir. 2001). As the determination whether to consider residual doubt as a mitigating factor in Montgomery's case is neither contrary to nor an unreasonable application of clearly established United States Supreme Court precedent, this claim is dismissed.

98

24.[54]   *Petitioner's sentence is in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court and jury did not have before them nor did they consider all relevant mitigating evidence.*

In this claim, Montgomery argues that the trial court and jury did not consider relevant mitigating evidence.  In particular, Montgomery claims that precluding Buzz Fay (once convicted of murder and three years later found innocent) from testifying, ignoring Montgomery's excellent Death Row disciplinary record, and failing to consider extreme intoxication as mitigating factors, violated Montgomery's right to due process. The court disagrees.

A judge need not admit mitigating evidence that is merely cumulative of evidence already before the jury. *Green v. Back Laundry Mac. Co*, 490 U.S. 504, 507 (1989).  By incorporating the guilt phase evidence into the penalty phase of the trial, the court made all possibly mitigating evidence from the guilt phase available to the jury at the penalty phase.

That defendants can be erroneously sentenced to death was clearly an issue before the jury.  (Tr. 2055, 2313-2315.)  Thus, the testimony of Buzz Fay to that effect would have been merely cumulative.  As well, ample evidence of Montgomery's intoxication at the time of the murders (Tr. 1464) and instructions on capacity and the jury's consideration of any testimony "relevant to the issue of whether Montgomery should be sentenced to death" had been presented to the jury. (Tr. 2313.)  Montgomery was clearly aware of his own disciplinary record on Death Row, yet chose not to introduce that evidence to the jury.  The trial court and jury cannot be blamed for failing to consider that record as mitigating evidence.  Montgomery bore the burden of producing mitigating evidence during the penalty phase.  *Greer v. Mitchell,* 264 F.3d 663, 687 (6th Cir. 2001).

---

[54]   This claim is properly preserved for habeas review; the Respondent does not argue otherwise

There was thus no error in declining Montgomery's motion to introduce this evidence during penalty phase proceedings.

20.[55]    *Montgomery's convictions and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the evidence was insufficient as a matter of law to sustain his capital felony murder and murder convictions.*

38.    *Montgomery's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the state failed to prove beyond a reasonable doubt that any constitutional error which occurred at his trial was harmless.*

40.    *Montgomery's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the evidence presented at trial was insufficient as a matter of law to sustain conviction.*

42.    *Montgomery's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that he was made death-eligible by the commission of a misdemeanor.*

As these claims all deal with the sufficiency of the evidence to convict and sentence Montgomery, the court analyzes them together.  In essence, Montgomery argues the evidence against him of aggravated robbery was insufficient because it was based on the uncorroborated testimony of Heard, because the state failed to prove beyond a reasonable doubt that any constitutional error was harmless, and that in any event, he was just joyriding in Ogle's car and did not intend to permanently deprive Ogle of her car.  None of these claims has merit.

Sufficient evidence supports a conviction if, after viewing the evidence (and the inferences to be drawn therefrom) in the light most favorable to the prosecution, the court can conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

---

[55]    This claim was only partially preserved for habeas review.  Nor was it argued in Montgomery's Traverse.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

*Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003); *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002), *cert. denied*, 537 U.S. 1192 (2003).  This standard does not permit a federal court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to the ultimate facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *McKenzie*, 326 F.3d at 727.  This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime and not to the state's burden to prove the absence of an affirmative defense.  *Allen v. Redman*, 858 F.2d 1194, 1196-98 (6th Cir. 1988).

In these claims, Montgomery alleges that:

*(a).    Heard's testimony was uncorroborated and therefore insufficient*.

The Constitution does not require corroboration of an accomplice's testimony to render it sufficient to support a conviction.  *Foster v. Ward*, 182 F.3d 1177, 1193 (10th Cir. 1999).  Even if the Constitution did require corroboration, there was sufficient corroboration in this case. Montgomery admitted to taking a taxi to the Hill Avenue apartment the early morning of March 8, 1986.  Moreover, with Montgomery's aid, the police were finally able to locate Ogle's body.  The gun used to kill both Ogle and Tincher belonged to Montgomery and was purchased by a man meeting Montgomery's description and wearing a jacket matching one owned by Montgomery only days before the shootings. Ogle's car was located a block from Heard's house, where Heard testified that Montgomery ordered Heard to take it. This evidence sufficiently corroborated Heard's testimony

to conclude that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).

> *(b).     The state did not prove that any constitutional error was harmless.*

Montgomery does not cite, nor is this court aware, of any Supreme Court decision that requires the State to prove that any constitutional error occurring at trial is harmless.  To the contrary, in this civil habeas corpus action, Montgomery, not the State, has the burden of proving constitutionally prejudicial error in the state court proceedings.  *LaVallee v. Delle Rose*, 410 U.S. 690 (1973).

> *(c).     Montgomery was not made death eligible by commission of a misdemeanor (i.e., joy riding)*

In this sub-claim, Montgomery argues that there was no evidence that he intended to permanently deprive Ogle of her car.  Rather, he argues that he only intended to take the car for a joy ride, a misdemeanor offense.  This court is not persuaded by Montgomery's argument.

The record evidence supports the State's claim that Montgomery intended to permanently deprive Ogle of her car (i.e., there was evidence Montgomery killed Ogle, drove the car away from the murder scene, and told Heard to take the car to Heard's home).  There was thus sufficient evidence, when viewed in the light most favorable to the prosecution, to prove Montgomery murdered Ogle while committing or attempting to commit aggravated robbery of Ogle's car.  As the Ohio appellate court explained:

> In addressing the factors necessary to establish aggravated robbery, the court in *State v. Ballard* (1984), 14 Ohio App.3d 59, syllabus, stated as follows:
>
>> Under R.C. 2911.02, the elements of robbery must occur simultaneously in order for the offense to occur.  Therefore, the state must prove that the accused's intent to deprive the owner of the property, as well as the actual taking (elements

> of the theft offense), coincided in point of time with the force or threat of force used in committing the theft offense, or in fleeing thereafter.

Hence, the accused must have the intent to deprive the owner of the property in question at the time of the taking of the property.

In reviewing the propriety of such a finding on the part of the jury in the instant case, this court is constrained from invading the province of the jury. We must merely review whether there was substantial evidence to satisfy reasonable minds as to the guilt of the accused. *State v. Sandoffsky (1928), 29 Ohio App. 419.* In the instant case we must review whether appellant formed the proper intent to commit aggravated robbery. As noted by the court in *State v. Wallen* (1969), 21 Ohio App.2d 27, paragraphs three and four of the syllabus:

> 3. In a criminal case, a guilty intent may be established from inferences reasonably drawn by the jury from the facts which have been proved beyond a reasonable doubt, including acts and statements of a defendant. While objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does.
>
> 4. In a criminal case, criminal intent is usually a question of fact for determination by the jury, and it can be inferred from facts and circumstances reasonably tending to manifest a mental attitude.

It can reasonably be inferred from appellant's actions at the time of the offense the requisite intent to commit the aggravated robbery was present while committing the murder of Debra Ogle. For example, appellant specifically requested the victim drive him home in her automobile. Immediately after the shooting appellant took Ms. Ogle's automobile and returned to her apartment. Based on appellant's actions, it was reasonable for the trier of fact to conclude that the murder of Debra Ogle coincided with the aggravated robbery in question. Therefore, there was sufficient evidence to warrant appellant's conviction beyond a reasonable doubt.

*Montgomery*, 1988 WL 84427 at *13-14.

The court therefore dismisses Montgomery's claims of insufficient evidence to convict and support his sentence.

103

48.[56] *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that he is actually innocent of the offenses for which he was convicted and sentenced to death*

In making this "free standing" claim of actual innocence, Montgomery relies on *Herrera v. Collins*, 506 U.S. 390 (1993).[57]  (Pet. at 95.)  The circuit courts are split on whether *Herrera* recognizes such a claim.  Several courts have read *Herrera* as invalidating free-standing actual innocence claims in habeas.  *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998); *Sellers v. Ward*, 135 F.3d 1333, 1338-39 (10th Cir. 1998); *Guinan v. United States*, 6 F.3d 468, 470 (7th Cir. 1993); *Meadows v. Delo*, 99 F.3d 280, 283 (8th Cir. 1996).  Other courts have read *Herrera* as authorizing a free-standing claim of actual innocence, or have at least assumed for the sake of argument that habeas courts could consider free-standing claims of actual innocence.  *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc) (holding that "free-standing" actual innocence is a proper claim but not finding sufficient evidence of it); *Cornell v. Nix*, 119 F.3d 1329 (8th Cir. 1999); *O'Dell v.*

---

[56] This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[57] Montgomery's free-standing claim of actual innocence reads as follows:

246) Petitioner is factually and actually innocent of the offenses for which he was convicted and sentenced to death. [See, e.g., Post Conviction Exhibit TT.]

247) Petitioner was prejudiced by these substantial violations of his federal constitutional rights in that ultimately he was convicted and sentenced to death for offenses that he never committed in violation of law, the constitution, and all conceivable standards of human decency.  *Herrera v. Collins*, 506 U.S. 390 . . . (1993).

248) As a result of the foregoing errors, Petitioner Montgomery's rights to substantive and procedural due process, effective assistance of counsel, trial by an impartial jury, against cruel and unusual punishment and equal protection as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution were violated.

(Petition 95)

104

*Netherland*, 95 F.3d 1214, 1246 n. 25 (4th Cir. 1996) (assuming for the sake of argument that "free standing" actual innocence states a claim but noting that the *Herrera* opinion at 506 U.S. at 416-17 seems to dictate otherwise.)

For purposes of this analysis, the court assumes Montgomery may raise a "free-standing" claim of actual innocence.  The Supreme Court indicated that if such a claim exists, a petitioner must convince the Court "that those new facts unquestionably establish [Montgomery's] innocence." *Schlup v. Delo*, 513 U.S. 298, 316-17 (1995).  Montgomery has not offered any new facts that "unquestionably establish [his] innocence" and does not even suggest he has done so.  He merely refers to his post-conviction exhibit (Ex. 37, Ex. TT juvenile records, school records, and police records) which does not establish his actual innocence.

Moreover, while Montgomery challenges the presumption of correctness of state court findings, (Petition 1), he makes no effort to challenge specific facts found.  28 U.S.C. §2254(e)(1).  Federal courts must defer to state court factual findings, affording a presumption of correctness that a habeas petition may rebut only with clear and convincing evidence.  *Groseclose v. Bell*, 130 F.3d 1161, 1163-64 (6th Cir 1997).

As Montgomery has shown no new facts that "unquestionably establish [his] innocence," his claim of actual innocence fails.

### E. Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668, 698 (1984), the United States Supreme Court ruled that to show counsel was ineffective, a habeas petitioner must demonstrate first that counsel's performance was deficient, that is, that "the benchmark for judging any claim of ineffectiveness must

105

be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.  A habeas claim of ineffective assistance of counsel must prove two elements:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.  If a federal habeas court fails to find either prong, the writ will not issue.

The Sixth Circuit Court of Appeals has applied *Strickland* to reject habeas corpus claims regarding strategic defense counsel decisions.  In *Meeks v. Bergen*, the Circuit held:

> In *Strickland*, . . . the Supreme Court stated that where there is more than one possible defense, and counsel conducts a substantial investigation into the possible defenses, the strategic choice made as a result of the investigation is "virtually unchallengeable."

749 F.2d 322, 327-28 (6th Cir. 1984).  The Court noted additionally that even should counsel fail to conduct a substantial investigation into each of several plausible lines of defense, representation might nonetheless be effective.  *Id.* at 328; *see also Chandler v. Jones*, 813 F.2d 773 (6th Cir. 1987); *Krist v. Foltz*, 804 F.2d 944 (6th Cir. 1986).

On the issue of prejudice, in *Lockhart v. Fretwell*, 506 U.S. 364 (1993), the Court held that with respect to Sixth Amendment claims, "the 'prejudice' component of the *Strickland* test . . . focuses on the question of whether counsel's deficient performance renders the result of the trial

106

unreliable or the proceeding fundamentally unfair." *Id.* at 372.  The Court explained further that "unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.*

> 19.[58]  *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution as he received the ineffective assistance of counsel during both the guilt determination and penalty phases of his capital trial.*

In these claims, Montgomery argues that trial counsel failed to provide adequate representation during his trial in that his counsel:

> a.  *Failed adequately prepare their expert witness, Dr. Gerald Briskin as to the correct standard to be used in determining mitigating factors;*

In this claim, Montgomery argues that defense counsel failed to prepare their expert witness, Dr. Gerald Briskin, adequately as to the correct standard to be used in determining mitigating factors.[59]  In particular, Montgomery argues that Dr. Briskin confused the notions of not guilty by reason of insanity and the statutory mitigating factor that Montgomery was under a mental disability which would mitigate Montgomery's actions.  Ohio Rev. Code Ann. § 2929.04(B) and (7).  The record does not support Montgomery's claim.  Dr. Briskin's testified that he was:

> however, able to find that [Montgomery's] psychosis would be a mitigating factor in terms of the crime which he is alleged to have committed.  So, he

---

[58]  This claim was only partially preserved for habeas review.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

[59]  Ohio Rev. Code Ann. § 2929.04(B)(3) ('[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect lacked substantial capacity to appreciate the criminality of the offender's conduct to the requirements of the law") and (B)(7)("[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death.")

>had no defense of not guilty by reason of insanity, even though in my
>judgment he met the statutory requirements in Ohio to be described as
>mentally ill. And by that – and I'll elaborate further in my testimony,
>mental illness – and I paraphrase the statute – is substantial disorder of
>thought, memory, mood that affects an individual's judgment, behavior, and
>ability to interpret reality.

(Tr. 2190.) Dr. Briskin also testified as follows: "Now, I am certain that that young man is mentally ill. But I am not able to tell you whether that mental illness was in action, so to speak, at the time of his crime. So, I could not support a not guilty by reason of insanity defense." (Tr. 2130-2131.) The record also suggests that trial counsel understood this distinction when he argued that Montgomery's mental illness "ought to be considered as mitigation only," (Tr. 2288-2289, 2291-2292) and that the trial court likewise understood the distinction (Ex. 3 at 6: considering mental illness only as a factor "to substantiate an additional mitigating factor raised under § 2929.04(B)(7)").

The court cannot say, under these circumstances, that had Briskin been "better prepared," the jury verdict would have differed.

>    b.    *Failed properly to prepare for the mitigation evidence;*

In this claim, Montgomery argues only that "[d]efense trial counsel were deficient by failing to adequately investigate in preparation for the mitigation phase of Petitioner's trial. [Post Conviction Exh. EE.]." However, the exhibit Montgomery cites is only additional evidence (by Montgomery's aunt) of Montgomery's troubled early years and thus only rounds out the picture already provided by Montgomery's uncle and Dr. Briskin.[60]    There is no evidence to suggest that trial counsel

---

[60]    Montgomery's aunt, Verna Middleton, averred as follows:

>    1)    I am the maternal aunt of William T. Montgomery (Terry). His

108

insufficiently prepared for mitigation.  To the contrary, the attorneys had Montgomery evaluated by a psychologist who testified at the mitigation hearing that Montgomery was mentally ill (indeed, the trial court found that Montgomery's upbringing was "so extreme, almost bizarre, that nothing short of the entire story [given by Montgomery's uncle] could accurately depict the situation").  Further, Montgomery's uncle testified to the terrible circumstances of Montgomery's upbringing and suggested that he might be rehabilitated after extensive counseling and therapy "under optimum treatment conditions." (3 A. 9-11.)  The additional insignificant testimony from Montgomery's aunt would not have altered the outcome of the sentencing.

       c.       *Failed to obtain Brady information withheld by the police*.

---

           mother, Carolyn Middleton Roots, is my older sister.  We along with our other siblings except for Michael Middleton, were born in Arkansas.  In the mid 1940s our family moved to and settled in Toledo, Ohio;

2)     In 1965, while she was sixteen years old and married to William Montgomery, Carolyn became pregnant.  She did not realize she was pregnant until she was in the sixth month of her term.  Terry was born on January 2, 1966, after his mother spent New Years Eve partying.

3)     Carolyn, while pregnant with Terry was taking unknown prescribed from her physician and "acted crazy";

4)     Terry was "the holleringness" baby and constantly cried as a child.  On several occasions, my mother, Lula Mae Middleton, Caarolyn and myself pulled Terry around the house in a pillow stuffed cardboard box to stop his crying and each time we stopped pulling Terry he would begin the cry;

5)     Terry smoked cigars at age 2 and also alcohol;

6)     At the age of 6 or 7, Terry was still smoking cigars and began to smoke marijuana and drink liquor.  At the age of 13 Terry wore three piece suits to school every day;

7)     I was not called as a witness at the mitigation phase of Terry's trial.  If I had been called, I would have offered this information as evidence for consideration by the jury of Terry's sentence.

Ex. 37, Ex. AA.

This claim is merely blaming counsel for failing to prevent error that has already, on its merits, been found to be meritorious.  Because the court finds that the State improperly withheld exculpatory evidence, prejudicing Montgomery's trial thereby, it necessarily must find that counsel cannot be held accountable for the State's failure to provide them with exculpatory evidence.  This claim lacks merit.

> *37.[61]*    *Petitioner's conviction and sentence violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that his appellate counsel failed to raise or adequately address substantial capital and other well-established criminal law issues on appeal.*

In this omnibus ineffective assistance of appellate counsel claim, Montgomery merely takes 28 claims from his petition and lays them at the feet of his appellate counsel.  These claims include that appellate counsel failed to argue that:

> *a.    The Ohio death penalty statute violates Article VI of the United States Constitution and various international laws.  Petitioner's conviction and sentence are improper in that the statute has been applied to him.*
>
> *b.    Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution were violated in that he was improperly denied his right to bond.*
>
> *c.    Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that statements were taken from him in violation of the requirements of Miranda v. Arizona, 396 U.S. 868 (1969).*
>
> *d.    Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that there is a sufficient amount of residual doubt that exists to cause the sentencer to find that the mitigation outweighs the aggravating circumstances in this case.*

---

[61]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

110

e.    *Petitioner's sentence of death violates the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because a complete record of all of the proceedings was not maintained and the appellate review was done from an incomplete record.*

f.    *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court and jury did not have before them nor did they consider all relevant mitigating evidence.*

g.    *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the jury considered the absence of mitigation as an aggravating factor.*

h.    *Petitioner's death sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the state was allowed to present evidence of a prior juvenile conviction and the sentencers considered the conviction as an aggravating circumstance.*

i.    *Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that two of the jurors who convicted him and sentenced him to death were acquainted with police officers who testified at his trial.*

j.    *Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to excuse for cause two jurors who were biased against him.*

k.    *Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that he was made death-eligible by the commission of a misdemeanor.*

l.    *The statutory provisions governing the Ohio capital punishment scheme violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.   Petitioner's conviction and sentence are improper in that the scheme is unconstitutional on its face and as applied to him.*

m.    *Petitioner's death sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the state was allowed to present evidence of a prior juvenile conviction and the sentencers considered the conviction as an aggravating circumstance.*

n.    *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because he was not permitted a continuance between the guilt and mitigation phases of the trial.*

o.    *Petitioner's convictions and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the evidence was insufficient as a matter of law to sustain his capital felony murder and murder convictions.*

111

p.     *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the trial court improperly instructed the jury at the mitigation phase of the trial.*

q.     *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the trial court improperly instructed the jury on all statutory mitigating factors.*

r.     *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the trial court improperly instructed the jury at the guilt phase (reasonable doubt) of the trial.*

s.     *Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution because the State of Ohio used its peremptory challenges to exclude individuals who expressed reservations about the death penalty.*

t.     *Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution as the state systematically eliminated African Americans from the jury.*

u.     *Death qualification of the jury that convicted and sentenced him to death denied Petitioner of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

v.     *Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that his appellate counsel failed to raise or adequately address substantial capital and other well-established criminal law issues on appeal.*

w.     *Petitioner's convictions and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the trial court failed to properly instruct the jury at the guilt phase of the trial.*

x.     *Petitioner's conviction and sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the jury was shown inflammatory and gruesome photos of the victim during the guilt phase of his trial.*

y.     *Petitioner's conviction and sentence violates the Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

z.     *Petitioner's conviction and sentence violates the Eighth and Fourteenth Amendments to the United States Constitution due to the use of the same specifications elevate the crime with which he was charged to a higher level and to make him death eligible.*

aa.    *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the state was permitted to argue first and last at the mitigation phase of the proceedings.*

> bb.    *Petitioner's convictions and sentence violates the Fifth, Sixth, Eighth, Ninth,*
> *and Fourteenth Amendments to the United States Constitution in that the trial*
> *court refused to answer the jury's request for additional instructions.*

These claims have each been raised on their merits in this habeas petition and found wanting.

In assessing ineffective assistance of appellate counsel claims, this court is required to look not only

at the ineffective assistance claim, but also the underlying claim.  *Byrd v. Collins*, 209 F.3d 486, 524-

28 (6th Cir. 2000).  A meritless underlying claim will not support a claim of ineffectiveness of

counsel.  *Strickland v. Washington*, 466 U.S. 668, 698 (1984).

Moreover, appellate counsel are not required to raise every issue on appeal.  To the contrary,

in *Jones v. Barnes*, 463 U.S. 745 (1983), the Court rejected the argument that competent counsel is

required to raise every conceivable non-frivolous issue in quoting an appellate practice manual

advising:

> Most cases present only one, two, or three significant questions. . . . Usually,
> . . . if you cannot win on a few major points, the others are not likely to help,
> and to attempt to deal with a great many in the limited number of pages
> allowed for briefs will mean that none may receive adequate attention. The
> effect of adding weak arguments will be to dilute the force of the stronger
> ones. R. Stern, Appellate Practice in the United States 266 (1981).

*Id* at 752.  The Court went on to hold:

> There can hardly be any question about the importance of having the appellate
> advocate examine the record with a view to selecting the most promising issues for
> review. This has assumed a greater importance in an era when oral argument is
> strictly limited in most courts -- often to as little as 15 minutes -- and when page
> limits on briefs are widely imposed. See e.g., Fed. Rule App. Proc. 28(g);
> McKinney's New York Rules of Court §§ 670.17(g)(2), 670.22 (1982). Even in a
> court that imposed no time or page limits, however, the new per se rule laid down
> by the Court of Appeals is contrary to all experience and logic. A brief that raises
> every colorable issue runs the risk of burying good arguments -- those that, in the
> words of the great advocate John W. Davis, 'go for the jugular,' Davis, The
> Argument of an Appeal, 26 A.B.A.J. 895, 897 (1940) -- in a verbal mound made

113

> up of strong and weak contentions. See generally, e.g., Godbold, Twenty Pages and
> Twenty Minutes -- Effective Advocacy on Appeal, 30 S.W.L.J. 801 (1976).

*Id.* at 752-53.

A defendant is not denied the effective assistance of counsel as measured by the test of *Strickland v. Washington* where counsel adheres to the guidance of the Supreme Court in *Jones v. Barnes. See also Evitts v. Lucey*, 469 U.S. 387 (1985). In *Smith v. Murray*, 477 U.S. 527, 535-536 (1986), the Court again specifically addressed the issue:

> After conducting a vigorous defense at both the guilt and sentencing phases of
> the trial, counsel surveyed the extensive transcript, researched a number of
> claims, and decided that, under the current state of the law, 13 were worth
> pursuing on direct appeal. This process of "winnowing out weaker arguments
> on appeal and focusing on" those more likely to prevail, far from being evidence
> of incompetence, is the hallmark of effective appellate advocacy. *Jones v.
> Barnes*, 463 U.S. 745, 751-752 . . . (1983). It will often be the case that even the
> most informed counsel will fail to anticipate a state appellate court's willingness
> to reconsider a prior holding or will underestimate the likelihood that a federal
> habeas court will repudiate an established state rule. But, as *Strickland v.
> Washington* made clear, "[a] fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to evaluate
> the conduct from counsel's perspective at the time."

*Id.* at 689.  Montgomery's appellate counsel raised thirty-two assignments of error. Appellate counsel could have decided that adding further issues would only bury meritorious claims "in a sea of meritless claims."  Montgomery's appellate counsel simply decided not to raise every frivolous claim, a decision well within the discretion of effective counsel. Thus, Montgomery can meet neither prong of the *Strickland* test, since his appellate counsel was not deficient for failing to raise every issue on direct appeal and there is no evidence of prejudice.  466 U.S. at 698.  This claim must be dismissed.

114

### F. Constitutionality of Ohio Death Penalty

In claims 8, 27, 28, 29, 39, 41, 45, 46, and 47, Montgomery argues that the Ohio state death penalty statute is unconstitutional on its face and as applied to him.

> 8.[62]    *Petitioner's conviction and sentence violate the Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

> 39.[63]    *Petitioner Montgomery's death sentence is unreliable, inappropriate, and violates the Eighth and Fourteenth Amendments to the United States Constitution.*

> 45.[64]    *The statutory provisions governing the Ohio capital punishment scheme violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.  Petitioner's conviction and sentence are improper in that the scheme is unconstitutional on its face and as applied to him.*

Based on *Gregg v. Georgia*, 428 U.S. 153, 188-195 (1976), *Furman v. Georgia*, 408 U.S. 238 (1972), and *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001) this court denies Montgomery's claim that his conviction and sentence violate the United States Constitution.

---

[62]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[63]    This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

[64]    This claim was only partially preserved for habeas review.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

27.[65]    *The requirement that Petitioner prove the existence of mitigating factors by a preponderance of the evidence precluded the sentencer from considering all of the mitigating evidence and compelled a presumption of death in violation of his Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

On the basis of the holding in *Smith v. Mitchell*, 345 F.3d 177, 213-14 (6th Cir. 2003) (shifting the burden of proof in mitigation not unconstitutional), the court dismisses this claim.

28.[66]    *Petitioner's death sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that Ohio's statutory scheme provides that findings of pre-sentence investigations be furnished to the judge, jury, and prosecutor who may use the evidence against him in determination of his sentence.*

On the basis of the holding in *Sumner v. Shuman,* 483 U.S. 66, 72 (1987) (citing *Gregg,* 428 U.S. at 189-190 n.38), the court dismisses this claim as meritless.

29.[67]    *Petitioner's sentence violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in that the state was permitted to argue first and last at the mitigation phase of the proceedings.*

Even if this sequence does place a capital defendant at a disadvantage, and the court does not so find, this fact does not implicate a constitutional violation.  As long as a state requires the

---

[65]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

[66]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

[67]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

116

prosecution to prove the existence of all aggravating circumstances, the defendant's constitutional rights are not violated.  *Walton v. Arizona*, 497 U.S. 639, 649-51 (1990).[68]

> *41.[69]  Petitioner's conviction and sentence violate the Eighth and Fourteenth Amendments to the United States Constitution due to the use of the same specifications to elevate the crime with which he was charged to a higher level and to make him death eligible.*

In this claim, Montgomery argues his constitutional rights were violated because the State:

> used the same underlying offense, aggravated robbery, both to elevate the killing of Ogle from murder to [a] death eligible of aggravated murder, and to represent an aggravating circumstance to actually condemn Petitioner to death . . . and that he was prejudiced by these violations of his federal constitutional rights in that this duplicative use of aggravated robbery fails to perform the constitutionally mandated task of narrowing the class of persons who are eligible for death [so that] all persons convicted of the 'felony murder' type of aggravated murder <u>automatically</u>, without any additional 'narrowing' evidence from the [s]tate, have 'felony murder' aggravating circumstance applied against him.

---

[68]   This aspect of the *Walton* holding is unaltered by the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002).  In that case, the Court overruled *Walton* because it found *Walton* irreconcilable with *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a case in which the Court held that the Sixth Amendment does not permit a judge to impose a sentence that would exceed the maximum sentence to which the defendant would be exposed if punished pursuant to the facts found by a jury.  Thus, because *Walton* found Arizona's capital sentencing constitutional even though it permitted a judge alone to find aggravating factors and impose a death sentence, the *Ring* Court overruled it.  The Court limited its holding, however, overruling *Walton* only "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty."  *Ring*, 536 U.S. at 609.  Consequently, the portion of *Walton* finding it permissible for the defendant to be required to proved the existence of mitigating factors by a preponderance of the evidence remains intact.

[69]   This claim was properly preserved for habeas review.  The Respondent does not argue otherwise.

117

(Pet. 83.)  This claim has been repeatedly raised and found wanting.  For instance, as the Supreme Court noted in reviewing the Louisiana death penalty (which is similar to the Ohio death penalty statute) in *Lowenfield v. Philips*:

> To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens,* 462 U.S. 862, 877 (1983); *cf. Gregg v. Georgia*, 428 U.S. 153 (1976). Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. *Id.* at 162-164 (reviewing Georgia sentencing scheme);*Proffitt v. Florida,* 428 U.S. 242, 247-250 (reviewing Florida sentencing scheme). By doing so, the jury narrows the class of persons eligible for the death penalty according to an objective legislative definition. *Zant, supra,* 462 U.S., at 878 ("[S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty").

> In *Zant v. Stephens*, *supra*, we upheld a sentence of death imposed pursuant to the Georgia capital sentencing statute, under which "the finding of an aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty." Id., at 874.. We found no constitutional deficiency in that scheme because the aggravating circumstances did all that the Constitution requires.

> The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in Jurek v. Texas, 428 U.S. 262 (1976), establishes this point. The Jurek Court upheld the Texas death penalty statute, which, like the Louisiana statute, narrowly defined the categories of murders for which a death sentence could be imposed. If the jury found the defendant guilty of such a murder, it was required to impose death so long as it found beyond a reasonable doubt that the defendant's acts were deliberate, the defendant would probably constitute a continuing

118

threat to society, and, if raised by the evidence, the defendant's acts were an unreasonable response to the victim's provocation. Id., at 269. We concluded that the latter three elements allowed the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provided for jury discretion. Id., at 271-274. But the opinion announcing the judgment noted the difference between the Texas scheme, on the one hand, and the Georgia and Florida schemes discussed in the cases of Gregg, *supra*, and *Proffitt*, supra: "While Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose.... In fact, each of the five classes of murders made capital by the Texas statute is encompassed in Georgia and Florida by one or more of their statutory aggravating circumstances.... Thus, in essence, the Texas statute requires that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed. So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option--even potentially--for a smaller class of murders in Texas." 428 U.S., at 270-271 (citations omitted).

It seems clear to us from this discussion that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase. See also Zant, supra, 462 U.S., at 876, n. 13 discussing Jurek and concluding: "[I]n Texas, aggravating and mitigating circumstances were not considered at the same stage of the criminal prosecution."

Here, the "narrowing function" was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the

119

>consideration of mitigating circumstances and the exercise of discretion.
>The Constitution requires no more.

484 U.S. 231, 244-46 (1988).  On this basis, the court denies this claim for relief.

>46.[70]    *The Ohio death penalty statute violates Article VI of the United States Constitution and various international laws.  Petitioner's conviction and sentence are improper in that the statute has been applied to him.*

This court finds the reasoning in *Celestine v. Butler*, 823 F.2d 74 (5th Cir. 1987), *cert denied* 483 U.S. 1036 (1987) persuasive.  In *Celestine*, the petitioner, alleging racial discrimination, claimed that treaties of which the United States was a signator superseded Louisiana law under the Supremacy Clause.  The court held that "how these issues are to be determined is settled under American constitutional law," *Id.* at 79-80.  Like *Celestine*, Montgomery has not set forth a single argument "directed at showing that the United States, via these international agreements, assented to provide additional factors for the decision to impose the death penalty or to modify the decisional factors required by the United States Constitution as interpreted by the Supreme Court."  *Id.* at 80.  Also persuasive is the fact that since the reinstatement of the death penalty in *Gregg v. Georgia*, 429 U.S. 875 (1976), the Supreme Court has never relied on those international agreements to find a death penalty unconstitutional.

---

[70]    This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

47.[71]   *Petitioner's sentence is improper as death by electrocution constitutes a blatant disregard for the value of human life, entails unnecessary and wanton infliction of pay, and diminishes the dignity of man and violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.*

That electrocution is a cruel and unusual punishment is no longer an issue in Ohio because the Ohio legislature last year repealed electrocution as a means of carrying out the death penalty.  The Ohio death penalty is now carried out only by lethal injection.  As Montgomery does not suggest that lethal injection is cruel and unusual, the court dismisses this claim.

As Montgomery has demonstrated no constitutional infirmity with the Ohio death penalty statute on its face or as applied, these claims for habeas relief are denied.

## V. CONCLUSION

**Certificate of Appealability**

The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a Certificate of Appealability ("COA") is appropriate to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims). Thus, in concluding this Opinion, this court now considers

---

[71]   This claim was not preserved for habeas review because it was not presented to the state courts in timely fashion.  Nevertheless and in an abundance of caution, the court reviews the claim on its merits to ensure that no miscarriage of justice occurred.  It did not.

whether to grant a COA to any of the claims Montgomery presented in his 28 U.S.C. § 2253 Petition.

That statute states in relevant part:

> *** (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.

This language is identical to the requirements of the pre-AEDPA statutes requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a constitutional right, rather than merely a federal right. The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Slack*, 529 U.S. at 483. Thus, the Court determined that "[t]o obtain a COA under § 2253(c), a habeas petitioner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable [fact-finders] could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" *Id.* at 483-84 (quoting *Barefoot*, 463 U.S. at 893 n.4).[72]

---

[72]      The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim. If the

122

After taking the above standard into consideration, the court finds that three issues merit further review. Consequently, the court GRANTS a COA as to Montgomery's first claim (juror bias/incompetent juror), fifteenth claim, sub-claim (b)(withheld police report with David Ingram statement), and forty-third claim (trial court's failure to grant a motion for change of venue based on pre-trial publicity) for relief.

Jurists of reason could conclude that the court's decision to deny Montgomery's first ground for relief is debatable. While Juror Lukasiewicz stated to the trial court that her ability to fairly decide the case would not be affected by the dream she had about Dr. Briskin, a reasonable jurist could argue that her statements to the court were sufficiently bizarre to warrant her removal regardless of what she stated to the court. Thus, a COA will issue for this claim.

The court also finds that a reasonable jurist could conclude that the withholding of the police report containing Ingram's statements does not warrant habeas relief under *Brady*. While this court held that the police report was exculpatory and clearly could have impeached Heard's testimony, jurists of reason could debate whether the police report alone, measured against other evidence of Montgomery's guilt that the prosecution presented during trial, was sufficiently material to undermine any confidence in the outcome of his trial. Thus, a COA will issue as to this claim.

---

claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id.* at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim that the district court has determined procedurally defaulted. In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis supplied).

Finally, the court finds its decision regarding claim forty-three is debatable.  Although the court held that the pre-trial media publicity to which the venire was exposed did not taint the jury that ultimately served, a jurist of reason could find that, based on this publicity and the understandable public outcry that the murder of two young girls elicited, the trial court erred in denying Montgomery's motion for a change of venue.

The court finds no other claims to be debatable among jurists of reason as no other ground for relief comes close to presenting a federal constitutional or legal violation. In many instances, Montgomery's claims involve time-worn legal arguments that this court and established precedent have found to be without merit. Consequently, the court DENIES a COA as to all other claims for relief.

Accordingly, the court grants Montgomery's petition and issues a writ of habeas corpus as follows.  The Respondent shall either: (1) set aside Montgomery's conviction for aggravated murder and the death sentence attendant thereto; or (2) conduct another trial.  The Respondent shall retry Montgomery, or set aside his conviction and sentence for aggravated murder within

124

180 days from the effective date of this Opinion.  On this Court's own motion, execution of this

Opinion and, hence, its effective date, is stayed pending appeal by the parties.

IT IS SO ORDERED.

*/S/SOLOMON OLIVER, JR.*

SOLOMON OLIVER JR.

UNITED STATES DISTRICT JUDGE

March 31, 2007

125